[No. F045114. Fifth Dist. June 29, 2005.]

RIDGECREST CHARTER SCHOOL, Plaintiff and Appellant, v. SIERRA SANDS UNIFIED SCHOOL DISTRICT, Defendant and Respondent.

990

## COUNSEL

John Kanberg; Spector, Middleton, Young & Minney, Paul C. Minney and Cynthia C. Jamison for Plaintiff and Appellant.

Foley & Lardner and Gregory V. Moser for California Charter Schools Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Miller Brown & Dannis and Sue Ann Salmon Evans for Defendant and Respondent.

Atkinson, Andelson, Loya, Ruud & Romo, James Scot Yarnell and Lisa R. Allred for The Education Legal Alliance of the California School Boards Association as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**BUCKLEY, J.**—The Charter Schools Act of 1992 (Ed. Code, § 47600 et seq. (the Act)),[1] as amended by Proposition 39 in November of 2000, requires public school districts to make their educational facilities available to charter schools operating in the district. The facilities provided must be sufficient to accommodate all the charter school's in-district students under conditions "reasonably equivalent" to those the students would have if they were attending a noncharter school in the same district. (§ 47614, subd. (b).) The facilities must also be "contiguous," meaning they must be on or adjacent to a school site. (*Ibid.*; Cal. Code Regs., tit. 5, § 11969.2, subd. (d).)[2] However, if the charter school's students cannot be accommodated at a single site, "contiguous facilities" may include those "located at more than one site, provided that the school district shall minimize the number of sites assigned and shall consider student safety." (Regs., § 11969.2, subd. (d).)

In this case, the Ridgecrest Charter School (RCS) submitted a request to the Sierra Sands Unified School District (the District) to use the District's facilities for 223 students in kindergarten through eighth grade (K-8). The District offered to give RCS the use of 9.5 classrooms at five different school sites separated by a total of 65 miles. RCS claimed it was entitled to a single site inasmuch as there were several sites in the District capable of accommodating all 223 students. The District disagreed, and refused to modify the offer. RCS then filed a petition for writ of mandate directing the District to

---

[1] Except as noted, all further statutory citations will refer to the Education Code.

[2] We will refer from here forward to title 5 of the California Code of Regulations simply as "Regulations."

provide it with facilities at a single location. The court denied the petition, and RCS has appealed. We will reverse.

## BACKGROUND

### The Charter Schools Act

The Act was adopted in 1992 "to provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently from the existing school district structure . . . ." (§ 47601.) Charter schools were identified as a means to (1) improve student learning; (2) increase learning opportunities, especially for low-achieving students; (3) encourage the use of innovative teaching methods; (4) create new professional opportunities for teachers; (5) offer parents and students more choices within the public school system; and (6) give schools a way to change from a rule-based to a performance-based accountability system. (*Id.,* subds. (a)–(f).)[3]

A person or entity wishing to establish a charter school within a particular school district was required to submit a petition to the district's governing board, signed by a specified percentage of the district's teachers, and providing detailed information about the school's proposed operations. (§ 47605.)[4] In the present case, the District denied RCS's initial petition in 1999, a second petition in 2000, and its renewal petition in 2003. The 2000 petition, and the 2003 renewal, were later approved on an appeal to the State Board. (See §§ 47605, subd. (j), 47607.5.)[5]

The 1992 enactment provided a mechanism for state support of a charter school's operational costs, similar to that provided to school districts based

---

[3] Assembly Bill No. 544 (1997–1998 Reg. Sess.) (Assem. Bill 544), which amended the Act in 1998, added a seventh goal to this list: to "[p]rovide vigorous competition within the public school system to stimulate continual improvements in all public schools." (§ 47601, subd. (g), added by Stats. 1998, ch. 34, § 1.)

[4] Assem. Bill 544 amended this provision in 1998 to allow parents as well as teachers to sign a charter petition. It also circumscribed a school district's discretion to deny the petition, and it permitted the petition's proponents to submit it to the State Board of Education (State Board) if the district denied it. (Stats. 1998, ch. 34, § 6.) (See *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125 [89 Cal.Rptr.2d 745] (*Wilson*) [upholding the Act, as amended by Assem. Bill 544, against a state constitutional challenge].)

[5] The District notes that the State Board is thus the chartering agency, as if to suggest the District therefore should not be responsible for accommodating RCS's request for school facilities. The court rejected a similar sort of argument in *Sequoia Union High School Dist. v. Aurora Charter High School* (2003) 112 Cal.App.4th 185 [5 Cal.Rptr.3d 86], where a high school district argued it should not be responsible for providing facilities to a charter school approved by an elementary school district.

on their average daily attendance (ADA), but it made no specific provision for the charter school's *facilities*. (§ 47612.)

In 1998, Assem. Bill 544 added section 47613.5, which provided in subdivision (a) that, subject to certain exceptions, "charter school operational funding shall be equal to the total funding that would be available to a similar school district serving a similar pupil population." "Operational funding" was defined to mean "all funding other than capital funding." (Former § 47613.5, subd. (c)(1), repealed eff. July 7, 1999; see now § 47630 et seq.) (Stats. 1999, ch. 78, §§ 32.5, 32.8.)

Assem. Bill 544 also added section 47614, which then provided: "A school district in which a charter school operates shall permit a charter school to use, at no charge, facilities not currently being used by the school district for instructional or administrative purposes, or that have not been historically used for rental purposes provided the charter school shall be responsible for reasonable maintenance of those facilities." (Stats. 1998, ch. 34, § 15.)

### Proposition 39

Proposition 39, also known as the "Smaller Classes, Safer Schools, and Financial Accountability Act," made two significant changes in the law affecting charter schools. First, and most important, it amended the state Constitution to create an exception to the 1 percent limit on ad valorem taxes on real property, and to reduce from two-thirds to 55 percent the number of voters required to approve any bonded indebtedness proposed to be incurred by a school district for the "construction, reconstruction, rehabilitation, or replacement of school facilities." (Prop. 39, § 4, as approved by voters, Gen. Elec. (Nov. 8, 2000).)

Second, Proposition 39 amended section 47614 to read in part as follows:

"(a) The intent of the people in amending Section 47614 is that *public school facilities should be shared fairly among all public school pupils, including those in charter schools.*

"(b) Each school district shall make available, to each charter school operating in the school district, facilities sufficient for the charter school to accommodate all of the charter school's in-district students in conditions *reasonably equivalent* to those in which the students would be accommodated if they were attending other public schools of the district. Facilities provided shall be *contiguous*, furnished, and equipped, and shall remain the property of the school district. The school district shall make reasonable efforts to provide the charter school with facilities near to where the charter school

wishes to locate, and shall not move the charter school unnecessarily."[6] (Italics added.)

The State Board subsequently adopted regulations governing the provision of facilities by school districts to charter schools pursuant to section 47614. (Regs., §§ 11969.1–11969.9, operative Aug. 29, 2002.)[7] They define "contiguous" as follows: ". . . As used in Education Code section 47614 [subdivision] (b), facilities are 'contiguous' if they are contained on the school site or immediately adjacent to the school site. If the in-district average daily classroom attendance of the charter school cannot be accommodated on any single school district school site, contiguous facilities also includes facilities located at more than one site, provided that the school district shall minimize the number of sites assigned and shall consider student safety." (Regs., § 11969.2, subd. (d).)

The California Department of Education (State Department), in its final statement of reasons for the proposed regulation (Gov. Code, § 11346.2), stated: "The main purpose of subdivision (d) is to provide guidance in the situation where no single school site operated by a school district is *large enough* to accommodate the charter school." (Italics added.)

The State Board also adopted a regulation setting out the provisions for determining whether facilities provided a charter school are "reasonably equivalent" to those charter school students would have if they were attending a district-run school. (Regs., § 11969.3.)

### RCS's Request for Facilities

In a letter to the District dated September 26, 2002, RCS made a Proposition 39 request for District facilities—both classroom and nonteaching

---

[6] A charter school is "operating" in a school district if it is "currently providing public education to in-district students," or it has "identified at least 80 in-district students who are meaningfully interested in enrolling in the charter school for the following year." (§ 47614, subd. (b)(5).) "Facilities requests based upon projections of fewer than 80 units of average daily classroom attendance for the year *may* be denied by the school district." (§ 47614, subd. (b)(4), italics added; see *Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139 [18 Cal.Rptr.3d 417] [upholding district's denial of facilities request for lack of documentation to support projection of the number of in-district students meaningfully interested in attending a charter school].)

[7] Section 47614, subdivision (b)(6), as enacted by Proposition 39, provides in part: "The State Department of Education shall propose, and the State Board of Education may adopt, regulations implementing this subdivision . . . ."

space (Regs., § 11969.3, subd. (b))—sufficient to accommodate 223 in-district, K-8 students for the 2003–2004 school year.[8]

At a meeting on February 20, 2003, the District's governing board approved a recommendation by the superintendent that it make available, beginning November 1, 2003,[9] a total of eight classrooms at four different elementary (K-5) schools, and one and one-half classrooms at one of its two middle (6–8) schools. In addition, RCS would be entitled to the shared use of other space at the schools (e.g., computer lab, library, kitchen, office space, multi-purpose room, and playground) on a prorated basis: 6.51 percent of the day at the elementary schools, and 5.73 percent of the day at the middle school. The board, at least implicitly, rejected alternatives of buying or leasing portable classrooms; of redrawing school attendance boundaries and increasing class size; of discontinuing the reduction of kindergarten class size; and of changing to a year-round multi-track school calendar.[10]

The District sent this "preliminary response" to RCS in a letter dated February 24, 2003. RCS responded with an alternative proposal that it be permitted to use a particular site (Vieweg) then being used primarily for

---

[8] "In-district" students are those who would be eligible to attend district schools by virtue of their living in the district. (Regs., § 11969.2, subd. (c).) It is thus possible for a charter school to have more students than it has "in-district" students, because a charter school may not refuse to admit someone who lives outside the district in which the school operates. (§ 47605, subd. (d).)

An existing charter school, like RCS, must submit its request for facilities to the school district by October 1 of the *preceding* fiscal year. (Regs., § 11969.9, subd. (b).) Subdivision (a) of this section requires that the charter petition for a *new* charter school must be approved before it may file a facilities request. According to the Department's final statement of reasons for these subdivision (a) time requirements, "This section is intended to ensure that a charter school is or has a reasonable chance of becoming a viable concern before requiring the school district to plan modifications in its programs to accommodate the charter school. For example, *accommodating a charter school might involve moving district-operated programs or changing attendance areas*." (Italics added.)

[9] RCS's school year was scheduled to begin in September of 2003. However, the District was not required to provide facilities until November in light of section 47614, subdivision (b)(3), which provides: "Each school district's responsibilities under this section shall take effect three years from the effective date of the measure which added this subparagraph, or if the school district passes a school bond measure prior to that time[,] on the first day of July next following such passage." The District had not passed a Proposition 39 bond measure.

[10] The superintendent presented the board with a four-page written analysis of the RCS facilities request, focusing on the "reasonably equivalent" requirement, along with his recommendation set out above. The superintendent's analysis mentioned these other alternatives, but did not discuss them. And it made no mention of the requirement that the facilities provided a charter school must be "contiguous." The minutes of the meeting indicate only that: "Following discussion, consideration of other options, and a comment from [an RCS] parent, motion passed to make available classroom spaces . . . and non-teaching areas under [the superintendent's] second [recommended] scenario."

nonacademic purposes. The District rejected that proposal as unfeasible. And, in a letter dated March 25, 2003, it reiterated the same proposal it had made earlier, this time in the form of a "final facilities offer." The final offer stated in part: "The District is unable to accommodate RCS's anticipated in-District elementary grade average daily attendance on any single school site. Therefore, the District's facilities offer includes facilities located at more than one site. The District has attempted to minimize the number of sites and considered student safety in developing this facility offer."

A further exchange of letters followed. RCS challenged the District's final offer on the ground, among others, that it failed to meet the contiguity requirement in section 47614. The District responded, through its attorney, that it had made "every reasonable effort to locate and create space for [RCS] at the fewest possible sites." RCS rejected the District's final offer on May 1, 2003. On June 24, 2003, it made a "Final Demand for Contiguous Facilities." And finally, on July 29, 2003, RCS filed a verified petition for writ of mandate and a complaint for declaratory relief, supported by several documentary exhibits.[11]

### The Petition for Writ of Mandate

RCS's action sought a declaration of its right under section 47614 to "contiguous" school facilities, and an order directing the District to perform its duty to provide facilities at a single site or, if that were not possible, to provide them in such a way as to "minimize student dislocation and maximize student safety."

After an answer was filed and certain objections made, a hearing followed on November 6, 2003, and was continued to December 4th. In a written ruling dated December 8th, the court stated in part:

"Ridgecrest Charter School contends that it is entitled to a single school site to house its students. That relief is denied.

---

[11] A charter school must accept or reject the school district's facilities offer in its entirety, and must do so within 30 days after the offer is made or by May 1, whichever is later. (Regs., § 11969.9, subd. (f); State Department, Final Statement of Reasons, p. 13.)

RCS's petition alleged: "On June 2, 2003 and June 12, 2003, representatives from [RCS] and [the District] met to discuss [the District's] facilities offer. Representatives of [the District] indicated that if [RCS] 'surrendered' its charter to [the District,] the District would house the program on one site. [RCS] rejected this hostile take-over option." We find no support for this claim in the record.

RCS's petition was verified by its attorney, not by anyone from the school.

"It also contends that if more than one school site is offered, such offer must minimize its students' dislocation and maximize student safety. . . . [¶] Sierra Sands Unified School District responds that it has discretion to allocate space and facilities.

"I am ruling that the District does not have absolute discretion to allocate space and facilities. [¶] I am also ruling that based on the record before me I am unable to find that the District has abused its discretion in the instant case. The District argues that it is not required to make findings with regard to its decision-making process, noting that the regulations do require findings in other circumstances but not in this one. Reluctantly accepting this argument, I nevertheless feel that findings should be required such that a court could be in a position to make a proper determination as to whether a school district has or has not abused its discretion in any given case."

Judgment was entered and this appeal followed.

## DISCUSSION

RCS maintains, essentially, that the District was obligated under section 47614 to provide it with facilities at *one* of the several school sites in the District having sufficient space to handle 223 K-8 students. It contends, in other words, that the ability of a school district to "accommodate" a charter school's students at a single school site, for purposes of the contiguity requirement, relates only to the physical capacity of the facilities at that site. Thus, this argument goes, since there are several such sites within the District, the District's discretion was limited to determining which of them to make available to RCS (subject to the requirement that the District make reasonable efforts to provide a site near RCS's existing location).

The District, on the other hand, contends that it need accommodate RCS students only insofar as it is capable of doing so "without excessive disruption to and interference with the District's students' education." It claims, in effect, to possess virtually unlimited discretion to decide whether an accommodation would be "excessive." "The District," it asserts, "has been granted discretion under the statute and its implementing regulations to determine *whether* to offer contiguous sites to the charter school." (Italics added.)

Our task then is twofold: We must first determine the scope of a school district's discretion under section 47614 in deciding how it will "accommodate" a charter school's request for facilities. And then we must decide whether the District abused its discretion under the circumstances in this case.

## The Scope of a District's Discretion

We begin by addressing what appears to us to be a faulty premise underlying the District's position: the notion that charter school students are not "district" students, with the implication their needs therefore must yield to those of the students in the district-run schools in deciding how to allocate space among them. In his declaration in opposition to the writ petition, for example, superintendent Milligan asserted: "The Education Code and Regulations speak to sharing fairly the District facilities[,] which does not require the District to unnecessarily displace District students and disrupt their educational program to accommodate charter school students." We interpret the Act differently.

In 1998, the Legislature, as part of Assem. Bill 544, added section 47615 to the Act to find and declare that charter schools are a part of the "Public School System, as defined in Article IX of the California Constitution"; that they come under the system's jurisdiction; and that they are entitled to "full and fair funding" under the Act. (§ 47615, subd. (a)(1)–(3).) In addition, the Legislature directed that the Act "shall be liberally construed" to effectuate these findings and declarations. (*Id.*, subd. (b); see generally, *Wilson, supra*, 75 Cal.App.4th at pp. 1136–1138 [rejecting a claim the Act, as amended by Assem. Bill 544, violated a state constitutional requirement to provide " 'a system of common schools' "].)

Assem. Bill 544, as we have said, also equalized operational funding for charter schools (former § 47613.5, subd. (a), now § 47630 et seq.); expanded the category of people who can sign a charter petition (§ 47605, subd. (a)); restricted a school district's discretion to deny the petition (*id.*, subd. (b)); and increased a statewide cap on the number of charter schools (§ 47602, subd. (a)). Moreover, Assem. Bill 544 required charter schools to be free, nonsectarian, nondiscriminatory, and open to all students (§ 47605, subd. (d)); to meet statewide standards and conduct the pupil assessments applicable to students in noncharter public schools (§ 47605, subd. (c)); to hire credentialed teachers (*id.*, subd. (*l*)); and to submit to state and local supervision and inspection (*id.*, subd. (k); §§ 47604.5, 47607). All these changes reflect an intent on the part of the Legislature to reduce, if not eliminate, the practical distinctions between charter schools and district-run schools. (See *Monzon v. Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16, 30 [273 Cal.Rptr. 615] [first rule of statutory construction is that court should ascertain intent of the Legislature so as to effectuate purpose of the law].)

More to the point for purposes of the present discussion, Assem. Bill 544 added a provision to the Act giving charter schools the right to use district facilities that are "not currently being used . . . for instructional or administrative purposes." (Former § 47614.) The right was thus very limited initially;

a charter school was entitled to use district facilities only if that would not interfere with the district's use of them. This restriction was effectively eliminated by Proposition 39.[12] At the same time as the proposition made it easier for school districts to raise money for the construction and rehabilitation of school facilities, it instructed that the facilities were to be "shared fairly among *all public school pupils*, including those in charter schools." (§ 47614, subd. (a), italics added.)[13]

Section 47614 also requires that the district facilities provided to charter school students *shall be* "reasonably equivalent" to the facilities the students would be using if they attended "*other public schools* of the district" (*id.*, subd. (b), italics added), and the facilities *shall be* "contiguous, furnished, and equipped" (*ibid.*).[14] These "shared fairly," "reasonably equivalent," and "contiguous" provisions seem clearly to require a district, in responding to a Proposition 39 facilities request, to give the same degree of consideration to the needs of charter school students as it does to the students in district-run schools.[15] (See *Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813–814 [114 Cal.Rptr. 577, 523 P.2d 617] [in determining breadth of agency's discretion, court construes statute conferring authority on agency with reference to entire statutory

---

[12] The District emphatically rejects the notion that Proposition 39 was intended to give charter schools "the same or equal access to district facilities." It observes that the proposition's preliminary "findings and declarations" state only that: "Students in public charter schools should be entitled to *reasonable access* to a safe and secure learning environment." (Prop. 39, § 2, subd. (e), italics added.) For the reasons that follow, we reject the District's contention.

[13] The District complains several times that it has *not* passed a Proposition 39 bond issue, but it nonetheless has been "left to share its existing and impacted school facilities with the charter school." Section 47614, of course, does not say a district must share only those facilities it has constructed or rehabilitated with Proposition 39 bond funds. And a district must accommodate only a charter school's *in-district* students. These are students who, in all probability, would be attending district-run schools if they were not enrolled in the charter school. Consequently, the District is not being asked to accommodate 233 *new* students, but merely to accommodate its existing students in a different configuration than it would otherwise.

According to RCS's facilities request, its students were distributed more or less evenly among the existing attendance areas for the District's seven elementary and two middle schools.

[14] "Shall" means the provision is mandatory. (§ 75.)

[15] Notably, the District invokes the "reasonably equivalent" requirement to justify its conclusion that RCS's elementary and middle school students cannot be accommodated at the same school site, i.e., because they would be assigned to different sites if enrolled in district-run schools, and because the average classroom size at its middle schools is a bit greater than at its elementary schools (903 versus 890 square feet). We do not understand the equivalency requirement to demand such mathematical precision. Classroom size is only one of several criteria for determining equivalency (Regs., § 11969.3, subd. (c)), and classroom size *per student* would appear under the regulations to be the more important consideration.

scheme of which it is part so whole may be harmonized and retain effectiveness].)

We find additional support for this conclusion in the Department's final statement of reasons for the proposed regulations implementing the Proposition 39 shared facilities requirement. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031] [agency's regulations have same binding force as statute; agency's interpretation of statute or regulation is entitled to consideration and respect by the courts, but its binding effect is contextual].)

■ Referring to the regulation allowing "contiguous facilities" to be located at more than one school site (Regs., § 11969.2, subd. (d)), the Department explained: "The main purpose of subdivision (d) is to provide guidance in the situation where no single school site operated by a school district is *large enough* to accommodate the charter school." (Italics added.) This suggests that, all else being equal, a charter school should be housed at a single site if one exists with the capacity to handle all the school's students. "School site size" is also one of the factors considered in determining whether a site is "reasonably equivalent." (Regs., § 11969.3, subd. (c)(1)(A).)

■ In discussing the timeframe within which a new charter school must submit a facilities request (Regs., § 11969.9, subd. (a)), the Department explained: "This section is intended to ensure that a charter school is or has a reasonable chance of becoming a viable concern before requiring the school district to plan modifications to its programs to accommodate the charter school. *For example, accommodating a charter school might involve moving district-operated programs or changing attendance areas.*" (Italics added.) Plainly then, the regulations contemplate that some disruption and dislocation of the students and programs in a district may be necessary to fairly accommodate a charter school's request for facilities.

■ Section 47614, subdivision (b) requires that a school district, in responding to a request for facilities, "shall make reasonable efforts to provide the charter school with facilities near to where the charter school wishes to locate, and shall not move the charter school unnecessarily." According to the Department, its implementing regulation (Regs., § 11969.2) "specifically does not provide any guidance" about what constitutes such reasonable efforts, because "the statutory language provides a balance between favoring charter school students and favoring students in district-operated programs." In addition, referring to the requirement—in the regulation's definition of "contiguous" (Regs., § 11969.2, subd. (d))—that a district "shall minimize the number of sites assigned" if it cannot accommodate a charter school at a single site, the Department explained it had rejected, as

"unnecessary and redundant," a suggestion the regulation be drafted to require merely that a district make " *'every effort* to minimize' " the number of sites. (Italics added.)

■ In summary, we conclude a school district's exercise of its discretion in responding to a Proposition 39 facilities request must comport with the evident purpose of the Act to equalize the treatment of charter and district-run schools with respect to the allocation of space between them.[16] That is, we interpret "reasonably equivalent" and "shared fairly" to mean that, to the maximum extent practicable, the needs of the charter school must be given the same consideration as those of the district-run schools, subject to the requirement that the facilities provided to the charter school must be "contiguous."

■ "Contiguous" means "touching along all or most of one side" or, more generally, "near, next, or adjacent [to]." (Webster's New World Dict. (2d college ed. 1982) p. 307.) The requirement that charter schools be provided with "contiguous" facilities presumably means the facilities must be contiguous *to one another*, i.e., located at or near the same site; otherwise, there would not appear to be any reason for including the term in the statute.

■ Section 47614 does not say that a charter school's facilities must be "*reasonably* contiguous," or "*as contiguous as possible* without disrupting a district's other students." RCS argues the statute thus accords a district *no* discretion to provide facilities at more than one site if it has at least one site that is physically capable of housing all the charter school's students. The State Board's corresponding regulation (Regs., § 11969.2, subd. (d)) would seem to support this position. It permits more than one site only if there is none that can "accommodate" all charter school students, which means, according to the State Department's final statement of reasons, that there is no single site "*large enough* to accommodate" the charter school.

---

[16] Amicus curiae, the California Charter Schools Association (CCSA), maintains charter schools are entitled, under constitutional equal protection principles as well as by section 47614, to equal access to district facilities. This constitutional argument was not raised in the trial court, nor does RCS assert it now on appeal. We therefore decline to consider it. (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1274–1275 [36 Cal.Rptr.2d 404].) We also deny CCSA's request we take judicial notice of certain facts posited in support of the argument.

Amicus curiae, The California School Boards Association (CSBA), urges us not to adopt what it characterizes as RCS's position that section 47614 creates a " 'single school site mandate' " for charter schools. Such a reading of the statute, CSBA asserts, would intrude impermissibly on a school board's statutory authority to operate its local school system in the manner it considers best. We do not hold that section 47614 establishes an inflexible "single site" rule. Moreover, we agree with CSBA that "[c]harter school students are not entitled to better facilities choices than other district resident pupils."

██ However, we must construe section 47614 so as to harmonize it with the entire statutory scheme affecting charter schools. (*Clean Air Constituency v. California State Air Resources Bd., supra,* 11 Cal.3d at p. 814.) There is, plainly, some tension between the "shared fairly" and "reasonably equivalent" requirements in section 47614 on the one hand, and the "contiguous" requirement on the other. The first two suppose a balancing of all the factors—educational, logistical, financial, legal, and practical—that ordinarily go into deciding how to assign students among the various schools within a district (giving equal consideration to the "district" and charter school students). The third requirement, contiguity, supposes that all charter school students must first be assigned to the same site (assuming one exists large enough to house them all) before any consideration may be given to the other factors. These two extremes correspond roughly to the positions staked out by the parties in this case. We believe the answer lies somewhere in between, albeit toward the contiguity end of the scale. That is, at the risk of seeming to oversimplify a difficult and complex process, we think it must at least *begin* with the assumption that all charter school students will be assigned to a single site, and attempt from there to adjust the other factors to accommodate this goal. What all those other factors are, how much weight each ought to be given, and when consideration of them will make the single-site goal unfeasible, are all decisions that can only be made in light of the circumstances in each particular case.

## Abuse of Discretion

RCS sought a writ of mandate under section 1085 of the Code of Civil Procedure, which permits a court to issue the writ "to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded . . . ." (*Id.,* subd. (a).)

██ Generally, mandamus may be used only to compel the performance of a duty that is purely ministerial in character. (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 62 [114 Cal.Rptr.2d 62].) The remedy may not be invoked to control an exercise of discretion, i.e., to compel an official to exercise discretion in a particular way. (*Ibid.*) "A ministerial act has been described as 'an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his [or her] own judgment or opinion concerning such act's propriety or impropriety, when a given set of facts exists.' [Citation.] On the other hand, discretion is

the power conferred on public functionaries to act officially according to the dictates of their own judgment. [Citations.]" (*Morris v. Harper, supra,* 94 Cal.App.4th at p. 62.)

Here, of course, the District was obligated to follow the law—to provide RCS with facilities that were both "reasonably equivalent" and "contiguous"—but how it did that was largely a matter committed to its discretion. "Courts exercise limited review in ordinary mandamus proceedings. They may not reweigh the evidence or substitute their judgment for that of the agency. They uphold an agency action unless it is arbitrary, capricious, lacking in evidentiary support, or was made without due regard for the petitioner's rights. [Citations.] However, courts must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute. [Citation.] Because trial and appellate courts perform the same function in mandamus actions, an appellate court reviews the agency's action de novo. [Citation.]" (*Sequoia Union High School Dist. v. Aurora Charter High School, supra,* 112 Cal.App.4th at p. 195.)

As we have said, the superintendent prepared a four-page analysis for the District's governing board in response to RCS's facilities request, in which he set out with precision the number of square feet of classroom and nonclassroom space it would be necessary for the District to provide to meet the "reasonably equivalent" requirement in section 47614. But the analysis made no mention of, nor any apparent allowance for, the requirement that the facilities be "contiguous." The superintendent's analysis stated:

"*Facilities Available for Reallocation* [¶] . . . [¶]

"*Elementary Facilities*[17]

"Proposition 39 legislation requires that school districts provide classrooms of average size and condition to those provided to its own students. The condition of the schools is generally uniform. The average elementary classroom is 890 square feet. The average room sizes at Las Flores, Faller, Inyokern and Rand schools meet or exceed this measurement. The average classroom at Gateway Elementary is less than 820 square feet. This omits Gateway from consideration. . . .

---

[17] As noted previously, the superintendent determined it was necessary, in order to satisfy the "reasonably equivalent" requirement, to house RCS's elementary and middle school students at different sites. "Since the charter school is requesting K-8 facilities, Sierra Sands can expect to provide the facilities in the same manner in which it provides facilities to its own students. Therefore, facilities for the K-5 ADA will be allocated from the district's elementary sites while the space for the 6–8 ADA will be provided at the middle school sites."

"Presently, of these schools, Sierra Sands is expecting to have these classrooms available:

| | |
|---|---|
| "Faller | 2 classrooms |
| "Inyokern | 1 classroom |
| "Las Flores | 0 classrooms |
| "Rand | 1 classroom |

"Classrooms that are being used for a middle school, a lounge and a special projects office at Inyokern Elementary could be vacated to make three more classrooms available. A relocatable at Las Flores is being used for the elementary music program. That could be freed up if the music class/storage were housed elsewhere on campus. With the changes, a total of eight classrooms would be available for reallocation to the charter school:

| | |
|---|---|
| "Faller | 2 classrooms |
| "Inokern | 4 classroom[s] |
| "Las Flores | 1 classroom |
| "Rand | 1 classroom |

"*Middle School*

". . . The average middle school classroom is 903 square feet. The average room at Monroe Middle School meets this requirement. . . . [¶] . . . [¶]

"Presently, Sierra Sands is expecting to have no classrooms available for the charter school at Monroe. However, one classroom is being used for a testing room for speech and as a meeting room for College Health counselors. This room could be vacated. Also, a classroom that is being used for choir could perhaps be made available for half of the day. With these changes, 1.5 classrooms would be available for reallocation to the charter school."

The nonclassroom space, under the superintendent's recommended "Scenario 2," would be allocated on a percentage basis, as follows:

"Scenario 2 [elementary schools]: The multi-purpose room and the playground area are made available to the charter school for a total of 6.51 percent of the day. Space in the computer lab, RSP room, library and kitchen are cleared and made available to the school for 6.51 percent of the day. . . . [¶] . . . [¶]

"Scenario 2 [middle school]: The multi-purpose room, science room and lab, art, drama, choir, music, PE room and PE areas are made available to the

charter school for a total of 5.73 percent of the day. Space in the computer lab, RSP room, LEP/ELD rooms, library and kitchen are cleared and made available to the school for 5.73 percent of the day."[18]

This analysis addresses only the first part of the District's obligation—its duty to provide RCS with "reasonably equivalent" facilities—and omits any consideration of its equally important obligation to provide facilities that are "contiguous."[19] Indeed, it seems to reflect a preference for a time before passage of Proposition 39, when a school district was required only to provide a charter school with facilities it was not using.

Superintendent Milligan asserted in his declaration: "Because the charter school's projected ADA for the 2003–2004 school year is 233, with all but 75 of that 233 projected for the elementary school level, the District cannot accommodate all, or even a large proportion, of the charter school's elementary school enrollment at any of its elementary school sites without displacing a large number of District students from their elementary school. Furthermore, because of the significant distance between District schools, even if the entire charter school elementary school population was placed in two campuses, those sites would not be 'contiguous' because of the distance between District schools. Therefore, it is not physically possible for the District to place the Charter School students in a single site, or in contiguous sites, without displacing an excessive population of District students by moving anywhere from a quarter to a half of the affected school's students to another site."[20]

---

[18] As we understand these scenarios, RCS would have shared use of some facilities (e.g., the multi-purpose rooms), and exclusive use of certain others (e.g., the computer labs, libraries, and kitchens) for roughly 6 percent of the school day. Depending on the length of the day, that comes to about 20 minutes. It is difficult to imagine RCS would be able to make effective use of the kitchen, for example, in only 20 minutes. (It also is not clear to us that this arrangement comports with the "reasonably equivalent" requirement.)

This then is another argument for housing the RCS students at fewer sites, where they would comprise a greater percentage of the student population, and thus be entitled to proportionally more time to use the nonclassroom facilities. This assumes, of course, that the RCS students' use of nonclassroom space is based on their relative numbers at a particular school rather than in the district as a whole, since, in the latter case, the time they were allowed would reflect their use of several schools none of them is attending.

[19] The contiguity requirement directs that a school district, if it is not able to accommodate a charter school at any single site, must minimize the number of sites assigned to the school, and in so doing must consider student safety. (Regs., § 11962.2, subd. (d).) Student safety presumably includes a concern about the number and length of the trips that students (in both the charter and district-run schools) must make each day, and the means of transportation (by school bus or private car). The District's analysis likewise neglects to address this concern.

[20] According to the superintendent, the 2001–2002 enrollment at the four designated elementary schools was Faller 406, Inyokern 213, Las Flores 460, and Rand 8. The enrollment figures for the three other elementary schools in the District were Gateway 460, Pierce 446, and Richmond 440. It is not clear why the latter two schools were omitted from the

█ We have little doubt that accommodating RCS's facilities request will cause some, if not considerable, disruption and dislocation among the District's students, staff, and programs. But section 47614 requires that the facilities "should be shared fairly among all public school pupils, including those in charter schools." (*Id.*, subd. (a).) Providing facilities, whether or not they are reasonably equivalent in other respects, at five different school sites does not strike a fair balance between the needs of the charter school and those of the district-run schools. The District failed, in other words, to demonstrate either that it could not accommodate RCS at a single school site, or that it had minimized the number of sites in a manner consistent with the intent of the Act. This was an abuse of discretion.

█ In light of our conclusion, we briefly address the question of whether, and to what extent, a district is required to explain its action on a facilities request. The Legislature's declaration that facilities should be "shared fairly" among all students implies the district must offer some explanation for its decision regarding how the facilities will be allocated between the charter school and the district-run schools. (See *Sequoia Union High School Dist. v. Aurora Charter High School, supra*, 112 Cal.App.4th at pp. 195–196.) While detailed findings are not necessarily required, the explanation should be thorough enough, and factual enough, to permit effective review by the courts.

The present case provides a good example of the pitfalls of doing less. As we said, the superintendent's analysis of the RCS request addressed in some detail the requirement that facilities be "reasonably equivalent," but seemingly ignored the requirement that they be "contiguous." It was not until RCS filed a writ petition that the parties confronted the contiguity requirement in a series of declarations and counterdeclarations, objections and counter-objections which, typically, were more argumentative and conclusory than factual and expository. This led the trial court, in turn, to express its frustration at the lack of an adequate record upon which to conduct a review. We encountered the same frustration.[21]

█ In reviewing the action of a public agency in an ordinary mandamus proceeding, both the trial court and this court must ensure that the agency "has adequately considered all relevant factors, and has *demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.*" (*Sequoia Union High School Dist. v. Aurora Charter High School, supra*, 112 Cal.App.4th at p. 195, italics added.) It follows that we cannot make this determination in the absence of a statement of reasons

---

superintendent's analysis, or whether the schools were operating at their full capacities. The 2001–2002 enrollment at Monroe Middle School was 575.

[21] Both parties have asked us to take judicial notice of certain facts and events, all of which occurred *after* the hearing on RCS's writ petition. We deferred our ruling on these requests, and now deny them.

by the agency for its decision. (*McBail & Co. v. Solano County Local Agency Formation Com.* (1998) 62 Cal.App.4th 1223, 1229–1230 [72 Cal.Rptr.2d 923].)

The District cites *City of Santa Cruz v. Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 389 [142 Cal.Rptr. 873] in support of the proposition that public agencies are not required to issue written findings of fact as to their quasi-legislative determinations. The citation is inapt. A school district, in responding to a charter school's request for facilities, is not acting in a quasi-legislative capacity. (See *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 10–11.)

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to issue a writ of mandate ordering the District to set aside its "Final Offer of Facilities" and to issue a new offer of facilities consistent with section 47614 and Regulations sections 11969.1–11969.9, and with the views expressed in this opinion. Costs are awarded RCS.

Ardaiz, P. J., and Vartabedian, J., concurred.