Filed 4/9/15

# IN THE SUPREME COURT OF CALIFORNIA

CALIFORNIA CHARTER SCHOOLS
ASSOCIATION,

        Plaintiff and Respondent,

        v.

LOS ANGELES UNIFIED SCHOOL
DISTRICT et al.,

        Defendants and Appellants.

S208611

Ct.App. 2/5 B242601

Los Angeles County
Super. Ct. No. BC438336

In 2000, California voters enacted Proposition 39, which requires school districts to share their facilities with charter schools so that charter school students have access to facilities "reasonably equivalent" to those available to other public school students. (Ed. Code, § 47614, as amended by Prop. 39, as approved by voters, Gen. Elec. (Nov. 7, 2000).) In 2002, the State Board of Education (Board) issued regulations on how to implement this requirement. For more than a decade, the Board's regulations and the underlying mandate of Proposition 39 have been the subject of considerable litigation. (See, e.g., *Bullis Charter School v. Los Altos School Dist.* (2011) 200 Cal.App.4th 1022 (*Bullis*); *New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831; *Ridgecrest Charter School v. Sierra Sands Unified School Dist.* (2005) 130 Cal.App.4th 986; *Environmental Charter High School v. Centinela Valley Union*

1

*High School Dist.* (2004) 122 Cal.App.4th 139; *Sequoia Union High School Dist. v. Aurora Charter High School* (2003) 112 Cal.App.4th 185.)

This case, an action for declaratory relief, concerns the meaning of a Board regulation that governs the allocation of classrooms to charter schools. The regulation requires a school district to count the number of classrooms in certain "comparison group schools" and to divide the average daily attendance (ADA) of students at those schools by the number of classrooms. The resulting ADA/classroom ratio dictates how many classrooms the district must provide to a charter school that requests facilities.

In allocating classrooms to charter schools, the Los Angeles Unified School District (District) uses what it calls "norming ratios," which purport to establish throughout the District a uniform student/teacher ratio in a given grade level. The District contends that its use of these districtwide ratios, rather than ratios developed from counting classrooms in comparison group schools, satisfies the Board's regulation and provides reasonably equivalent facilities to charter schools. The District further contends that the classrooms to be counted are only those that are, in the words of the applicable regulation, "provided to" K-12 students, and not classrooms that are dedicated to other uses, such as preschool or adult education.

The California Charter Schools Association (CCSA) contends that the District violates the applicable regulation by using districtwide norming ratios rather than counting classrooms in comparison group schools to determine the allocation of classroom facilities. CCSA also contends that under the applicable regulation, the classroom count used to determine the ADA/classroom ratio must include some classrooms dedicated to preschool instruction or adult education as well as some classrooms used for noninstructional purposes. According to CCSA, the District's norming ratios improperly reduce the number of classrooms to which charter schools are entitled.

2

We agree with CCSA that the District's use of norming ratios, rather than counting classrooms in comparison group schools, violates the regulation governing the allocation of classrooms to charter schools. At the same time, we agree with the District that in allocating classrooms to charter schools, it must count only those classrooms provided to K-12 noncharter students and not classrooms dedicated to other uses. However, counting classrooms provided to K-12 students is not tantamount to counting classrooms staffed by teachers. The District's equation of the two in its norming ratios is another reason why those ratios do not comply with the Board's regulations. The District must therefore prospectively modify its approach to allocating classrooms to charter schools.

## I.

The Charter Schools Act of 1992 seeks "to provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently from the existing school district structure." (Ed. Code, § 47601.) Charter schools are public schools " 'free from most state laws pertaining uniquely to school districts.' " (*United Teachers of Los Angeles v. Los Angeles Unified School Dist.* (2012) 54 Cal.4th 504, 521.) The freedom granted to charter schools is intended to promote choice and innovation, and to stimulate "competition within the public school system." (§ 47601, subd. (g).) Like other public schools, charter schools are "accountable for meeting measurable pupil outcomes." (*Id.*, subd. (f).)

Charter schools receive state funding primarily based on the number and type of students they serve. (Ed. Code, § 47633.) Because charter schools have limited means of obtaining public funds to cover the cost of facilities, they often must rely on school facilities within the control of the school districts they compete with. Before the adoption of Proposition 39, a charter school was entitled "to use, at no charge, facilities not currently being used by the school district for

3

instructional or administrative purposes, or that have not been historically used for rental purposes." (Former § 47614, as added by Stats. 1998, ch. 34, § 15, p. 202.) In other words, charter schools had access only to public school facilities that districts weren't using.

Proposition 39 changed the way school districts must share facilities with charter schools. It amended Education Code section 47614 (hereafter section 47614) so that it now reads in relevant part: "(a) The intent of the people in amending Section 47614 is that public school facilities should be shared fairly among all public school pupils, including those in charter schools. [¶] (b) Each school district shall make available, to each charter school operating in the school district, facilities sufficient for the charter school to accommodate all of the charter school's in-district students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending other public schools of the district. Facilities provided shall be contiguous, furnished, and equipped, and shall remain the property of the school district. The school district shall make reasonable efforts to provide the charter school with facilities near to where the charter school wishes to locate, and shall not move the charter school unnecessarily." Section 47614 further provides in part: "Each year each charter school desiring facilities from a school district in which it is operating shall provide the school district with a reasonable projection of the charter school's average daily classroom attendance by in-district students for the following year. The district shall allocate facilities to the charter school for that following year based upon this projection." (§ 47614, subd. (b)(2).)

Subdivision (b)(6) of section 47614 provides that the "State Department of Education shall propose, and the State Board of Education may adopt, regulations implementing this subdivision, including but not limited to defining the terms 'average daily classroom attendance,' 'conditions reasonably equivalent,' 'in-

4

district students,' 'facilities costs,' as well as defining the procedures and establishing timelines for the request for, reimbursement for, and provision of, facilities." This rulemaking authority "complements [the Board's] general authority in [Education Code] section 33031 to 'adopt rules and regulations not inconsistent with the laws of this state . . . (c) for the government of the day and evening elementary schools, [and] the day and evening secondary schools . . . .' " (*California School Bds. Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 542.)

Pursuant to this regulatory authority, the Department of Education proposed and the Board adopted regulations to implement Proposition 39. The regulations included California Code of Regulations, title 5, section 11969.3, which provides the means for determining "whether facilities provided to a charter school are sufficient to accommodate charter school students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending public schools of the school district providing facilities, as required by Education Code section 47614(b)." (All citations to regulations are to this title unless otherwise indicated.)

According to the regulation, "[t]he standard for determining whether facilities are sufficient to accommodate charter school students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending public schools of the school district providing facilities shall be a comparison group of district-operated schools with similar grade levels." (§ 11969.3, subd. (a)(1).) "The comparison group shall be the school district-operated schools with similar grade levels that serve students living in the high school attendance area . . . in which the largest number of students of the charter school reside. The number of charter school students residing in a high school attendance area shall be determined using in-district classroom ADA projected for

5

the fiscal year for which facilities are requested." (*Id.*, subd. (a)(2).) When students in a district do not attend high school based on attendance areas, "the comparison group shall be three schools in the school district with similar grade levels that the largest number of students of the charter school would otherwise attend. For school districts with fewer than three schools with similar grade levels, the comparison group shall be all schools in the school district with similar grade levels." (*Id.*, subd. (a)(3).)

Subdivision (b)(1) of section 11969.3 (hereafter section 11969.3(b)(1)) provides that the ADA/classroom ratio in the comparison group schools dictates the number of classrooms a school district must allocate to a charter school: "Facilities made available by a school district to a charter school shall be provided in the same ratio of teaching stations (classrooms) to ADA as those provided to students in the school district attending comparison group schools. School district ADA shall be determined using projections for the fiscal year and grade levels for which facilities are requested. Charter school ADA shall be determined using in-district classroom ADA projected for the fiscal year and grade levels for which facilities are requested. The number of teaching stations (classrooms) shall be determined using the classroom inventory prepared pursuant to California Code of Regulations, title 2, section 1859.31, adjusted to exclude classrooms identified as interim housing." (§ 11969.3(b)(1).)

California Code of Regulations, title 2, section 1859.31 (hereafter section 1859.31) is a regulation implementing the Leroy F. Greene School Facilities Act (Ed. Code, § 17070.10 et seq.), which governs the allocation of state funds for school facilities construction. The regulation requires preparation of a school district inventory of classrooms to determine funding eligibility for facility construction and modernization. Under section 1859.31, "[t]he district shall prepare a gross inventory consisting of all classrooms owned or leased in the

6

district . . . ." Included in this inventory are any classrooms "for which a contract was signed for the construction or acquisition of facilities" or "for which construction work has commenced" at the time of application for funds requested under the act; classrooms used as "shops, science laboratories, computer laboratories, or computer classrooms"; classrooms "used for preschool programs"; classrooms "converted to any non-classroom purpose including use by others"; and classrooms "included in a closed school." (*Ibid.*)

In addition to the classroom sharing requirement of subdivision (b)(1) of section 11969.3, subdivision (b)(2) of the same regulation provides for the equitable sharing of "specialized classroom space, such as science laboratories," and subdivision (b)(3) addresses the sharing of "non-teaching station space" such as kitchens and administrative space.

To be eligible for the allocation of classrooms and other space in public schools, a charter school must submit a request for facilities documenting its projected ADA and other pertinent information by November 1 of the year before the school year for which the facilities are requested. (§ 11969.9, subds. (b), (c).) By the following February 1, the school district receiving the request must make a preliminary space allocation proposal that "[at] a minimum" "shall include (1) the projections of in-district classroom ADA on which the proposal is based, (2) the specific location or locations of the space, (3) all conditions pertaining to the space, including a draft of any proposed agreement pertaining to the charter school's use of the space, and (4) the projected pro rata share amount and a description of the methodology used to determine that amount. The district shall also provide the charter school a list and description of the comparison group schools used in developing its preliminary proposal, and a description of the differences between the preliminary proposal and the charter school's facilities request . . . ." (*Id.*, subd. (f).) After the charter school has had an opportunity to

7

respond to the proposal, the district must make a final space offer to the charter school by April 1, and the charter school must notify the District whether it accepts the offer within 30 days or by May 1, whichever is later. (*Id.*, subds. (g)–(i).)

## II.

CCSA is a nonprofit charter school membership organization whose members include several charter schools in the District. On May 17, 2007, CCSA filed two lawsuits against the District, claiming that the District had failed to comply with Proposition 39 in extending facilities offers to charter schools. On April 22, 2008, CCSA and the District entered into a settlement agreement to resolve those lawsuits.

Paragraph 3 of the settlement agreement states: "Provided that a CCSA member charter school submits [a] future facilities request that is legally sufficient under Proposition 39 and any Proposition 39 implementing regulations in effect at that time, LAUSD shall make a facilities offer to that charter school that complies with Proposition 39 and any Proposition 39 implementing regulations in effect at that time. This obligation shall apply to requests for facilities that are submitted for the 2008-2009 school year, shall inure to the benefit of all CCSA member charter schools . . . , and shall continue for the term of this Agreement [i.e., until June 30, 2013]."

On May 24, 2010, CCSA filed a complaint in superior court against the District, alleging breach of the settlement agreement (first cause of action) and violation of Proposition 39 (seventh cause of action). The complaint sought specific performance, a permanent injunction, appointment of a special master, and declaratory relief. CCSA filed a motion for summary adjudication of the first and seventh causes of action, which the trial court granted in part. The trial court ordered the District to extend facilities offers to all charter schools that submitted

8

legally sufficient facilities requests for the 2011–2012 school year and to make Proposition 39-compliant facilities offers to all CCSA member charter schools that submit legally sufficient facilities requests for future school years until the end of the settlement agreement. The trial court denied CCSA's requests for injunctive and declaratory relief. The District did not challenge this order.

On May 17, 2012, CCSA filed a motion to enforce the trial court's order with regard to the District's facilities offers for the 2012–2013 school year. According to CCSA, those offers, which were based on the District's norming ratios, failed to provide facilities to charter schools in the same ADA/classroom ratio as those provided to students attending comparison group schools, as required by section 11969.3(b)(1). The District's 2011–2012 budget described the norming ratio as follows: "Most District schools receive their base allocations of teachers, school administrators, school clerical positions, and various resources on the basis of Board-approved 'norms,' which determine the resources to be allocated individual schools." In response to charter school requests for facilities, the District explained that "consistent with norming ratios used for District students, the District provides classrooms to Charter School students at a ratio of 24:1 for grades K-3; 30.5:1 for grades 4-6; 28:1 for grades 7-8; and 30:1 for grades 9-12." According to the District, the norming ratios are an appropriate way to ensure that the ADA/classroom ratio in each charter school is reasonably equivalent to the ADA/classroom ratio in comparison group schools. By contrast, CCSA argued that the District's approach did not make use of comparison schools as section 11969.3 requires and excluded classrooms that should have been counted, thereby improperly inflating the ADA/classroom ratio used to determine the number of classrooms provided to charter schools.

Consistent with the level of generality at which the litigation was conducted, the trial court did not determine whether a particular charter school

9

was entitled to more classrooms. Instead, the trial court ordered that "in determining the number of teaching stations to provide to charter schools requesting facilities under Prop. 39, [the District] must comply with Section 11969.3(b)(1) of the Prop. 39 Implementing Regulations, and must not use 'norming ratios' to reduce teaching stations offered to charter schools in the future."

The District appealed this order, and the Court of Appeal sided with the District. The court acknowledged that "the regulatory language explicitly states that 'the number of teaching stations (classrooms) shall be determined using the classroom inventory prepared pursuant to California Code of Regulations, title 2, section 1859.31, [fn. omitted] adjusted to exclude classrooms identified as interim housing . . . .' The regulations have a clear formula that does not rely on how many students a district decides to put in each classroom as a district-wide average, but rather on how many students and classrooms, whether they are used as classrooms or not, the district has in the relative comparison group schools." But the court ultimately focused on this sentence in section 11969.3(b)(1): "Facilities made available by a school district to a charter school shall be provided in the same ratio of teaching stations (classrooms) to ADA as those *provided to* students in the school district attending comparison group schools." (Italics added.)

Drawing "a distinction between facilities that are 'provided' and 'classroom inventory,' " the court held that the District is required to count only those classrooms actually provided to K-12 students in deriving the ADA/classroom ratio used to allocate classrooms to charter schools. "If we were to adopt the analysis proffered by CCSA," the court explained, "it may well have anomalous results. For example, the District would have to count classrooms that have been contracted for but not yet built and classrooms at closed school sites. 'It is well

10

established that a statute open to more than one construction should be construed so as to avoid anomalous or absurd results.' " The court concluded that "[t]he District's use of norming ratios is consistent with the intent of Proposition 39" to ensure that "the charter school's in-district students are being accommodated in conditions reasonably equivalent to those in which those students would be accommodated if they were attending other public schools of the District."

We granted review.

## III.

We note at the outset that neither party raises mootness as a bar to our deciding this case. Although this litigation primarily concerned the allocation of facilities to charter schools in the 2012–2013 school year, the trial court's declaratory relief order prohibiting the District from using norming ratios will govern responses to future facilities requests. In that sense, this case is not moot. In any event, the legality of a school district's offer of facilities to charter schools in a given school year is an important question that is likely to recur yet evade review because of the relatively short duration of the academic year for which a facilities offer is made. (See *People v. Harrison* (2013) 57 Cal.4th 1211, 1217–1218; *Bullis*, *supra*, 200 Cal.App.4th at pp. 1032–1035.) Indeed, the same dispute is likely to recur between the parties to this litigation with each new school year. (See *Bullis*, at p. 1034.)

In addressing this dispute, we are mindful of the limited scope of the issue presented. The controversy here is not over whether a particular charter school was offered the right number of classrooms. Rather, CCSA requests declaratory relief with respect to the meaning of the pertinent regulations. The question before us is whether the District's use of norming ratios complies with Proposition 39 (§ 47614) and the implementing regulations (§ 11969.3). In passing judgment on cases requesting declaratory relief, we decide only actual controversies and refrain

11

from issuing advisory opinions. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170; *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 117.)

**A.**

As noted, section 11969.3, subdivision (a) (hereafter section 11969.3(a)) provides that "[t]he standard for determining whether facilities are sufficient to accommodate charter school students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending public schools of the school district providing facilities shall be a comparison group of district-operated schools with similar grade levels." (§ 11969.3(a)(1).) The regulation defines comparison group schools as "the school district-operated schools with similar grade levels that serve students living in the high school attendance area . . . in which the largest number of students of the charter school reside" (§ 11969.3(a)(2)) or, if a district's students do not attend high school based on attendance areas, the "three schools in the school district with similar grade levels that the largest number of students of the charter school would otherwise attend" (§ 11969.3(a)(3)). (See *Bullis, supra,* 200 Cal.App.4th at pp. 1054–1055.)

In proposing the comparison group methodology in section 11969.3, the Department of Education in its Final Statement of Reasons said: "Subdivision (a) identifies a comparison group of school district facilities for use in determining whether a facility proposed for a charter school is reasonably equivalent to the school district facilities that charter school students would otherwise attend. Specifically, the subdivision requires that the comparison group consists of schools with similar grade levels that serve students living in the high school attendance area in which the largest number of charter school students reside. The subdivision establishes a standard that is a middle ground between a comparison group that consists of all district-operated schools and a comparison group that

12

consists of one to three schools. Using all district-operated schools as the comparison group would present administrative and data problems for school districts. In addition, for large school districts, using all district-operated schools as the comparison group would result in a standard that might be significantly different than the neighborhood schools the charter school students would otherwise attend. (This is because in large school districts the conditions in schools may vary widely from neighborhood to neighborhood.) Using one to three schools would result in a group that is too small and would result in problems agreeing on the group selected." (Cal. Dept. of Ed., Final Statement of Reasons, drafted in support of regs. promulgated under Prop. 39 (2002), pp. 5–6 (Final Statement of Reasons).)

The District in its briefing contends that using districtwide student/teacher norming ratios instead of counting classrooms in comparison group schools does not violate section 11969.3(a): "[T]he District's norming ratio is a control that ensures the number of students to classrooms provided each District school is consistent by grade level. Therefore, the charter school's comparison group schools will have a reasonably equivalent ratio of students-to-classrooms to the norming ratios at which the charter school was allocated District facilities." At oral argument, the District maintained that the regulation does not require it to use the comparison group method to derive the ADA/classroom ratio; instead, the regulation only requires the District to be able to demonstrate that the facilities it offers to charter schools are equivalent to what it would have offered if it had used the comparison group method. In support of this position, the District quotes section 11969.3(a), which speaks of the comparison group as the "*standard for determining* whether facilities are sufficient to accommodate charter school students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending public schools of the school district

13

providing facilities." (§ 11969.3(a)(1), italics added.) The District reads this language to mean that the comparison group can be a *retrospective* "standard for determining" whether facilities provided to charter schools meet the reasonable equivalence standard. Further, the District says it has met the standard here, citing a document produced during this litigation that shows 12 facilities offers in which the number of classrooms provided to charter school students is reasonably equivalent to the number provided to noncharter public school students at comparison group schools.

But nothing in the record suggests that the 12 facilities offers are representative of the scores of offers made by the District or that the District identified those 12 offers using a valid sampling methodology. More fundamentally, the District is mistaken about the role of comparison group schools in the regulatory scheme. Section 11969.9, which sets forth the procedures that school districts must follow in making facilities offers, requires that "the district shall . . . provide the charter school a list and description of the comparison group schools used in developing its preliminary proposal" in response to a charter school's facilities request. (§ 11969.9, subd. (f).) This provision makes clear that the comparison group method cannot be used merely as a retrospective standard for determining reasonable equivalence; it must be used by school districts in developing their facilities offers to charter schools. The regulations prescribe a specific, transparent method for deriving the ADA/classroom ratio to be applied in allocating classrooms to charter schools, thereby allowing charter schools and the public to readily verify whether a district has complied with the regulation.

The District's alternative would require a charter school either to simply accept the District's assurance that its norming ratios produce reasonable equivalence in facilities between the charter school and its comparison group schools, or to compel the District through litigation to demonstrate reasonable

14

equivalence. We doubt this is what the Board had in mind when it adopted section 11969.3(a). Indeed, the Department of Education and the Board explicitly rejected a districtwide approach akin to the District's norming ratios in favor of the comparison group method. As noted, the department reasoned that in "large school districts, using all district-operated schools as the comparison group would result in a standard that might be significantly different than the neighborhood schools the charter school students would otherwise attend" "because in large school districts the conditions in schools may vary widely from neighborhood to neighborhood." (Final Statement of Reasons, *supra*, at pp. 5–6.) The regulation thus requires a more localized approach.

The District's norming ratios may be more administratively efficient and may reflect a desirable goal of making student/teacher ratios uniform throughout the District. And it may be that a school district and a charter school can agree on a method of allocation that is more efficient than one involving the comparison group method. (See § 11969.1, subd. (b) ["If a charter school and a school district mutually agree to an alternative to specific compliance with any of the provisions of this article, nothing in this article shall prohibit implementation of that alternative . . . ."].) But the District may not unilaterally impose on charter schools a method of determining ADA/classroom ratios that is at odds with the governing regulation. To the extent the District believes the comparison group method is too burdensome, it should address that concern to the Board or to the Legislature.

We hold that the District must comply with section 11969.3(a) by using comparison group schools in calculating the number of classrooms it will make available to charter schools in response to a facilities request.

**B.**

We now turn to the parties' dispute over which classrooms must be counted in determining the ADA/classroom ratio pursuant to section 11969.3(b)(1). CCSA

15

highlights section 11969.3(b)(1)'s directive that "[t]he number of teaching stations (classrooms) shall be determined using the classroom inventory prepared pursuant to California Code of Regulations, title 2, section 1859.31, adjusted to exclude classrooms identified as interim housing." CCSA argues that this language requires school districts to count classrooms strictly according to the section 1859.31 inventory, which accounts for all classrooms built or contracted for, no matter what their use. At the same time, CCSA appears to acknowledge that the breadth of the section 1859.31 inventory will improperly inflate the classroom count from the standpoint of ensuring reasonable equivalence in the allocation of classrooms to charter and noncharter public schools. To address this overbreadth, CCSA argues that the section 1859.31 inventory may be adjusted in a number of ways. We find CCSA's approach unpersuasive because none of its proposed adjustments is anchored in a plausible reading of section 11969.3(b)(1).

When interpreting a statute, " '[w]e begin with the text of the statute as the best indicator of legislative intent' [citation], but we may reject a literal construction that is contrary to the legislative intent apparent in the statute or that would lead to absurd results' [citation]." (*Simpson Strong-Tie Company, Inc. v. Gore* (2010) 49 Cal.4th 12, 27.) Likewise, when interpreting a regulation, we begin with its text, but we may reject a literal construction contrary to the legislative intent apparent in the statute that the regulation is implementing. The fundamental mandate of Proposition 39 is that school districts must make available to charter schools operating in the district "facilities sufficient for the charter school to accommodate all of the charter school's in-district students in conditions *reasonably equivalent* to those in which the students would be accommodated if they were attending other public schools of the district." (§ 47614, subd. (b), italics added.) The Board, in issuing implementing

16

regulations, had considerable discretion to prescribe how school districts are to satisfy this requirement.

As noted, the section 1859.31 inventory was originally intended to govern the allocation of funds for construction of new facilities, not the allocation of reasonably equivalent facilities to charter schools and other public schools. Reading section 11969.3(b)(1) to require a classroom count that is strictly based on the section 1859.31 inventory would require the District to count classrooms already provided to charter schools. While conceding that including such classrooms would improperly inflate the count, CCSA says the District could exclude such classrooms from the ADA/classroom ratio or, in the alternative, count the classrooms and add the ADA of any charter schools to the ratio's numerator. But this proposed adjustment appears entirely ad hoc; it is not rooted in any reasonable construction of section 11969.3(b)(1). It is, in CCSA's words, "a practical solution to the extent an impractical situation arises after the Implementing Regulations have been honestly interpreted."

CCSA also contends that unbuilt classrooms should be excluded, even though section 1859.31, subdivision (a) provides that a classroom inventory "shall" include classrooms "for which a contract was signed for the construction or acquisition of facilities or for which construction work has commenced" at the time a school district applies for funds to build new classrooms. In support of its position, CCSA cites the Board's Final Statement of Reasons, which says that "to account for the possible addition of schools and classrooms to the school district's inventory, the comparisons are calculated based on *the projected number of teaching stations* and projected ADA." (Final Statement of Reasons, *supra*, at p. 6, italics added.)

But section 11969.3(b)(1) makes clear that the ADA/classroom ratio is to be derived from "ADA projected for the fiscal year" and classrooms "determined

17

using the classroom inventory prepared pursuant to . . . . section 1859.31, adjusted to exclude classrooms identified as interim housing." Section 11969.3(b)(1) makes no mention of the projected number of teaching stations. The section 1859.31 inventory requires counting unbuilt classrooms, whether projected to be completed in the relevant school year or not, even though counting such nonexistent classrooms does not further Proposition 39's goal of reasonable equivalence in facilities between charter and noncharter public schools. CCSA proposes no plausible interpretation of section 11969.3(b)(1) that permits exclusion of classrooms included in the section 1859.31 inventory.

CCSA would also exclude certain classrooms used for preschool or adult education, relying on California Code of Regulations, title 2, section 1859.32 (hereafter section 1859.32). That regulation provides that after the gross section 1859.31 classroom inventory has been prepared, it "will be reduced" by excluding certain categories of classrooms, including any classroom to be "used exclusively for regional occupational centers, regional occupational programs, child care, preschool and/or Adult Education Programs, and [that] was built or acquired with funds specifically available for those purposes." (§ 1859.32, subd. (f).) But section 11969.3(b)(1) prescribes use of "the classroom inventory prepared pursuant to . . . section 1859.31," not use of the section 1859.31 inventory *subject to* the adjustments set forth in section 1859.32. Further, even if it were reasonable to construe section 11969.3(b)(1)'s reference to section 1859.31 as incorporating the adjustments in section 1859.32, the implication of CCSA's argument is that classrooms used exclusively for preschool or adult education purposes should be excluded from the ADA/classroom ratio only if those classrooms were "built or acquired with funds specifically available for" preschool or adult education purposes. (§ 1859.32, subd. (f).) This limitation, which has to do with a district's eligibility for school construction funds, seems arbitrary from the standpoint of

18

promoting reasonable equivalence in facilities for charter and noncharter public schools.

## C.

It is thus clear that the section 1859.31 inventory does not by itself provide a classroom count that furthers Proposition 39's goal of ensuring "reasonably equivalent" facilities for charter and noncharter public schools. (§ 47614, subd. (b).) In approaching this issue, the District contends that the classroom inventory requirement of section 11969.3(b)(1) must be read in light of the regulation's first sentence, which says: "Facilities made available by a school district to a charter school shall be provided in the same ratio of teaching stations (classrooms) to ADA as those *provided to* students in the school district attending comparison group schools." (*Ibid.*, italics added.) According to the District, only classrooms in the inventory that are "provided to" noncharter public school K-12 students in the District must be counted. On this view, unbuilt classrooms, classrooms already used by charter schools, and classrooms dedicated to preschool, adult education, or other uses besides K-12 education are not "provided to" such K-12 students and thus need not be counted in determining the ADA/classroom ratio under section 11969.3(b)(1).

We agree with this reading of section 11969.3(b)(1). Although section 11969.3(b)(1) says "[t]he number of teaching stations (classrooms) shall be determined using the classroom inventory prepared pursuant to . . . section 1859.31," the sentence of 11969.3(b)(1) that specifically addresses the allocation of facilities to charter schools refers to "*those* [classrooms] *provided to* students in the school district attending comparison group schools." (Italics added.) This language is naturally read to mean that the classrooms to be counted in deriving the ADA/classroom ratio for allocating facilities to charter schools comprise *a subset* of the classrooms counted in the section 1859.31 inventory — namely,

19

"those provided to" noncharter K-12 public school students in the district. (§ 11969.3(b)(1).) As noted, if the classroom count were based solely on the section 1859.31 inventory, it would include various classrooms that should be excluded for purposes of ensuring reasonable equivalence in charter and noncharter public school facilities. Counting only "those [classrooms] provided to" noncharter K-12 public school students in the district avoids this problem and, unlike the ad hoc adjustments proposed by CCSA, hews closely to the text of section 11969.3(b)(1).

Classrooms used for preschool or adult education, or by other charter schools are not "provided to" a district's noncharter K-12 public school students. Proposition 39 sought to level the playing field for charter and noncharter public schools with respect to facilities for K-12 education. There is no indication that Proposition 39 was intended to affect or account for the practice of school districts allowing their facilities to be used for educational or community programs other than their own K-12 educational program. Indeed, the 2008 settlement agreement between CCSA and the District acknowledges that preschool and adult education programs "may remain in the space they currently use."

However, accepting the District's position that the term "provided to" limits the scope of section 11969.3(b)(1) does not completely resolve the controversy before us. CCSA argues in its briefing that even if reasonable equivalence is keyed to classrooms "provided to" noncharter K-12 public school students, the District's norming ratios still produce an undercount because they "are based on the number of teachers LAUSD decides to hire for a school year, not on a calculation of the classrooms LAUSD actually has available for use. LAUSD ignores the fact that a classroom can be 'provided' to students even if it does not have an assigned teacher (e.g., by using an unstaffed classroom as a study room)." We agree. The fact that a classroom is not staffed by a teacher does not, by itself,

20

mean that it should not be counted as a classroom in determining the ADA/classroom ratio. A classroom that is used for K-12 student activities may qualify as a classroom "provided to" K-12 students, even if it is not staffed by a teacher specifically assigned to that classroom. Because the District's norming ratios are essentially student/teacher ratios, they may undercount to some degree classrooms provided to K-12 students and therefore do not comply with section 11969.3(b)(1)'s method of counting classrooms.

This understanding of the term "provided to" is consistent with the Legislature's conception of charter schools as public schools that "operate independently from the existing school district structure." (§ 47601.) The Legislature authorized the creation of charter schools in order to promote choice, innovation, and competition on the premise that charter schools, while remaining accountable for student outcomes, would be largely free to adopt different educational approaches and make different decisions than those made by the school districts in which they operate. Counting only those classrooms staffed by an assigned teacher would effectively impute to charter schools the same staffing decisions made by the District. But there is no reason to think a charter school would necessarily use classrooms in the same way that the District does.

In sum, we hold that counting classrooms "provided to" district students for purposes of section 11969.3(b)(1) is not the same as counting only those rooms a district elects to staff with a teacher. Nor is it the same as counting all rooms listed in the section 1859.31 inventory, although the inventory provides a starting point. Resolving what classrooms are "provided to" district students for purposes of calculating the ADA/classroom ratio for a particular school may depend on site-specific factors. Because the parties have not asked us to resolve any concrete dispute over the allocation of particular classrooms to a particular charter school, we decline to opine with any greater specificity here. We do not address whether,

21

for example, a room formerly used for K-12 classroom instruction but now used to store K-12 school supplies is a teaching station "provided to" students under section 11969.3(b)(1), a "specialized classroom space" under section 11969.3, subdivision (b)(2), or a "non-teaching station space" under section 11969.3, subdivision (b)(3), or whether it fits multiple categories. The proper classification of a disputed classroom or facility will ordinarily require a developed factual record that this declaratory relief action does not present.

## CONCLUSION

In responding to a charter school's request for classroom space, a school district must follow a three-step process. First, the district must identify comparison group schools as section 11969.3(a) prescribes. Second, the district must count the number of classrooms in the comparison group schools using the section 1859.31 inventory and then adjust the number to reflect those classrooms "provided to" students in the comparison group schools. Third, the district must use the resulting number as the denominator in the ADA/classroom ratio for allocating classrooms to charter schools based on their projected ADA. Here, the District's use of norming ratios departs from the required procedure by failing to use comparison group schools and by equating classrooms "provided to" students with classrooms staffed by teachers. In responding to future facilities requests, the District must count classrooms in a manner that conforms to the regulation.

22

For the reasons above, we reverse the judgment of the Court of Appeal.


**LIU, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** California Charter Schools Association v. Los Angeles Unified School District
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 212 Cal.App.4th 689
**Rehearing Granted**

_____

**Opinion No.** S208611
**Date Filed:** April 9, 2015
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Terry A. Green

_____

**Counsel:**

David R. Holmquist, Mark S. Fall, Nathan A. Reierson; Orbach, Huff & Suarez, David M. Huff, Steven Graff Levine, Marley S. Fox and Joanna Braynin for Defendants and Appellants.

Burke, Williams & Sorenson and John R. Yeh for California School Boards Association Education Legal Alliance and California State PTA as Amici Curiae on behalf of Defendants and Appellants.

Drociak, Yeager & Associates and Kenneth C. Yeager for Los Angeles NAACP as Amicus Curiae on behalf of Defendants and Appellants.

Andra Donovan for San Diego Unified School District as Amicus Curiae on behalf of Defendants and Appellants.

Jacqueline P. Minor and Michael L. Smith for Oakland Unified School District as Amicus Curiae on behalf of Defendants and Appellants.

Ricardo J. Soto, Julie Ashby Umansky, Phillipa L. Altmann; Latham & Watkins, James L. Arnone, Winston P. Stromberg, Vanessa C. Wu and Michele L. Leonelli for Plaintiff and Respondent.

Laws Office of Michael F. Keeley and Michael Keeley for Excellent Education Development as Amicus Curiae on behalf of Plaintiff and Respondent.

Ogletree, Deakins, Nash, Smoak & Stewart, Mark G. Kisicki and Erin L. Brinkman for Rocketship Education as Amicus Curiae on behalf of Plaintiff and Respondent.

Procopio, Cory, Hargreaves & Savitch, John C. Lemmo and Gregory V. Moser for Bullis Charter School as Amicus Curiae on behalf of Plaintiff and Respondent.

Meriem L. Hubbard and Joshua P. Thompson for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel:**

Procopio, Cory, Hargreaves & Savitch, Gregory V. Moser and Adriana R. Sanchez for National Alliance for Public Charter Schools as Amicus Curiae on behalf of Plaintiff and Respondent.

Law Offices of Young, Minney, and Corr, Paul C. Minney and Kathleen M. Ebert for Reed Hastings as Amicus Curiae on behalf of Plaintiff and Respondent.

Irell & Manella, David A. Schwars and Zachary T. Elsea for Richard J. Riordan as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David M. Huff
Orbach, Huff & Suarez
1901 Avenue of the Stars, Suite 575
Los Angeles, CA  90067
(310) 788-9200

James L. Arnone
Latham & Watkins
355 South Grand Avenue
Los Angeles, CA  90071-1560
(213) 485-1234