[No. A100952. First Dist., Div. Five. Sept. 25, 2003.]

SEQUOIA UNION HIGH SCHOOL DISTRICT, Plaintiff, Cross-defendant and Appellant, v.
AURORA CHARTER HIGH SCHOOL, Defendant, Cross-complainant and Respondent.

COUNSEL

Barrett K. Green and Littler Mendelson for Plaintiff, Cross-defendant and Appellant.

Spector, Middleton, Young & Minney, Paul C. Minney, David E. Scribner and Jessica J. Hawthorne for Defendant, Cross-complainant and Respondent.

OPINION

JONES, P. J.—Sequoia Union High School District (Sequoia) appeals a judgment granting a peremptory writ of mandate that commands Sequoia to provide Aurora Charter High School (Aurora) educational facilities sufficient to accommodate the Aurora students who live in the Sequoia district. Sequoia contends it is not responsible for providing the facilities because it did not sponsor Aurora and because Aurora has not demonstrated that its student body is comprised of the statutory requisite number of students residing in the Sequoia district to qualify for facilities.

BACKGROUND

The Charter Schools Act of 1992 (Ed. Code, § 47600 et seq.)[1] allows the establishment of a school that operates independently from the existing

---

[1] All further section references are to the Education Code.

school district structure. (§ 47601.) A charter school within a particular school district is established when a petition, containing the proposed charter for the school and signed by a specified percentage of designated people, is submitted to the district's governing board and the board grants the charter. (§ 47605, subds. (a) & (b).)

In January 1999, Aurora, then called the Bay Area Charter High School, submitted a charter petition to Sequoia. Sequoia did not grant the charter. Instead, it proposed that Aurora obtain a charter from the Redwood City Elementary School District (Redwood City), one of eight elementary districts that lie within Sequoia's geographical boundaries and whose students "feed into" Sequoia high schools. In March 1999, Sequoia executed a letter of intent with Redwood City, whereby Sequoia agreed to work with Redwood City and Aurora to develop a joint powers agreement which would provide public school choice to high school parents and students.

In April 1999, Redwood City granted Aurora's charter. Section X of the Aurora charter, entitled "Facilities," states that Aurora will have no impact on Redwood City's facilities "except to exercise [its] right to use, at no charge, facilities not currently being used by [Redwood City] for instructional or administrative purposes, per [Education Code] section 47614." In 1999, section 47614 provided: "A school district in which a charter school operates shall permit a charter school to use, at no charge, facilities not currently being used by the school district for instructional or administrative purposes, or that have not been historically used for rental purposes[,] provided the charter school shall be responsible for reasonable maintenance of those facilities." (Former § 47614; Stats. 1998, ch. 34, § 15.)

In May 1999, Sequoia and Redwood City executed a joint powers agreement concerning Aurora. They agreed that Sequoia would contribute services and/or cash to Aurora according to a prescribed formula based on average daily attendance. The agreement also provided that it would automatically terminate if a state agency or court determined that an elementary school district did not have the authority to grant a charter for a high school or that Sequoia was responsible for funding Aurora. In such case, Aurora's charter "shall revert" to Sequoia.

Aurora opened as a charter high school for the 1999–2000 school year and has been in operation since then.

In November 2000, section 47614 was amended when the voters approved Proposition 39. (Prop. 39, § 6, as approved by voters, Gen. Elec. (Nov. 8, 2000).) The statute now provides that school districts make facilities available to charter schools operating in the district that will accommodate all the

charter school's in-district students.[2] The district is to allocate facilities to the charter school based on the charter school's projected average daily classroom attendance of in-district students for the following year. (§ 47614, subd. (b).) The district may deny facilities if the projection is fewer than 80 units of average daily attendance. (§ 47614, subd. (b)(4).)

In December 2001, Aurora made a "Proposition 39" request to Sequoia for facilities, beginning July 1, 2002, based on a projection of 110 units of average daily attendance by in-district students. In March 2001, Sequoia denied the request because the projected average daily attendance did not appear realistic and the facilities request was properly directed to Redwood City, the district that granted Aurora's charter. It invited Aurora to provide Sequoia with the factual bases for its average daily attendance projections if Aurora "believe[d] the ADA projections can be substantiated." It also asked Aurora to provide legal authority for its claim that Sequoia, not Redwood City, was obligated to provide facilities to Aurora.

In May 2002, Sequoia brought an action for declaratory relief by which it sought an order that, inter alia, a school district is not required to provide funding or facilities for a charter school that was approved by another school district, and Sequoia was not required to provide facilities to Aurora.

Aurora cross-complained for, inter alia, a peremptory writ of mandate (Code Civ. Proc., § 1085) compellingSequoia to provide facilities pursuant to section 47614. Sequoia moved to deny the petition for writ of mandate because Aurora had not provided Sequoia factual support for its average daily attendance projections. Aurora then submitted an August 6, 2002 declaration of Alice Miller, Aurora's business manager and one of its founders, to support its petition. She declared that Aurora currently provided education to or had identified 97 students residing in the Sequoia district who showed meaningful interest in enrolling in Aurora for the 2002–2003 school year. She also declared that Aurora students historically maintained 95 percent attendance, so Aurora projected more than 92 units of average daily attendance for the 2002–2003 school year. Her declaration incorporated copies of enrollment and reenrollment applications and petitions from current and continuing Aurora students asking Sequoia to provide it with classrooms.

The trial court concluded that Aurora's projected enrollment and attendance were reasonable, and Sequoia was therefore obligated to provide facilities to Aurora. It ordered a writ of mandate to issue commanding Sequoia to comply with its section 47614 obligation to provide Aurora with educational facilities. After reaching an agreement with Aurora concerning the procedures for

---

[2] Section 47614, subdivision (b) is quoted at length, in Discussion, *post.*

Sequoia to provide the facilities, Sequoia filed a return to the writ setting forth these procedures. This appeal follows the judgment granting the peremptory writ.

## DISCUSSION

### I.

Sequoia contends that section 47614 obligates Redwood City, as the district that approved Aurora's charter, to provide facilities to Aurora.

■ Statutes implemented by initiative are construed by the same rules as statutes enacted by the Legislature. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) A court's fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the statute's purpose. (*Ibid.*) A court begins by examining the statute's language, giving the words their usual and ordinary meaning. (*Ibid.*)

a. *Section 47614 (Proposition 39)*

Proposition 39's stated intent is "that public school facilities should be shared fairly among all public school pupils, including those in charter schools." (§ 47614, subd. (a).) To that end, "Each school district shall make available, to each charter school operating in the school district, facilities sufficient for the charter school to accommodate all of the charter school's in-district students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending other public schools of the district." (§ 47614, subd. (b).) "Operating," as used in section 47614, means "either currently providing public education to in-district students, or having identified at least 80 in-district students who are meaningfully interested in enrolling in the charter school for the following year." (§ 47614, subd. (b)(5).)

■ The language of this statute nowhere limits the responsibility of providing accommodation to the charter school's sponsoring district. Rather, in unambiguous language, it imposes the obligation on "*each* school district" in which a charter school provides education to students who live in that district and who, were they not attending the charter school, would be accommodated by schools in that district. ■ When there is no ambiguity in a statute's language, courts "presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.]" (*Day v. City of Fontana, supra,* 25 Cal.4th at p. 272.) As high school students, Aurora students who reside in the Sequoia district would be accommodated by Sequoia's high schools, not Redwood City's elementary schools, if they did

not attend Aurora. Therefore, under the plain meaning of the statute, Sequoia must make facilities available to these Aurora students.

### b. *Sections 47614.5 and 47605, subdivision (a)(6)*

Sequoia contends that reading section 47614 in conjunction with two other sections of the Charter Schools Act supports its contention that an elementary school district that grants a charter for a high school has sole responsibility under section 47614 to provide facilities for the charter high school.

### i. *Section 47614.5*

Section 47614.5, entitled the Charter School Facility Grant Program, and enacted by the Legislature in 2001 (Stats. 2001, ch. 892, § 3), was enacted to provide assistance for the rent and lease of facilities for eligible charter schools. The statute defines eligible schools as those physically located in the attendance area of a public elementary school in which 70 percent or more of the pupil enrollment is eligible for free or reduced price meals. (§ 47614.5, subd. (a).) However, charter schools that receive "reasonably equivalent facilities *from their chartering authority pursuant to Section 47614*" are ineligible for this assistance. (§ 47614.5, subd. (d)(3), italics added.) Sequoia argues that the italicized portion of section 47614.5, subdivision (d)(3) implies that the school district that approved the charter is responsible for providing the charter school's facilities.

Although a rule of statutory construction requires every statute to be construed with reference to the entire system of law of which it is a part so that the whole system may be harmonized (*Landrum v. Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352]), it is unnecessary to apply that rule to ascertain the meaning of section 47614. "It is axiomatic that in the interpretation of a statute where the language is clear, its plain meaning should be followed. [Citation.]" (*Great Lakes Properties, Inc. v. City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244].) We reiterate that section 47614 states clearly and without restriction that each school district should provide accommodation for charter school students who would otherwise be students at the district's schools.

In any case, the italicized phrase of section 47614.5 does not imply that the obligation under section 47614 to provide facilities to a charter school lies with the sponsoring district. It simply precludes a charter school that is otherwise eligible for the section 47614.5 facility grant program funds from receiving those funds if the district that granted its charter provides the charter school's facility. The italicized language does not pertain to charter schools that are statutorily entitled to facilities from a district other than the one that granted their charters.

ii. *Section 47605, subdivision (a)(6)*

Section 47605, subdivision (a)(6) provides that, starting January 1, 2003, a school district may not approve a petition to establish a charter school serving pupils in a grade level that is not served by that district unless the petition proposes to serve pupils in all grade levels served by the district. The plain language of section 47605, subdivision (a)(6) nowhere obligates the approving school district to be solely responsible for providing facilities for all students who attend the charter school it approves. It simply precludes, for example, an elementary school district from granting a charter to a high school only; to be approved, the proposed charter school must also serve elementary school students. Likewise, a high school district cannot grant a charter to an elementary school only; the proposed school must also serve high school students.

Section 47605, subdivision (a)(6) cannot reasonably be read as relieving a school district from its section 47614 obligation to provide facilities for in-district charter school students whom the district would be required to accommodate if they were not attending a charter school operating in that district. ▮ Section 47614 clearly contemplates that multiple districts may have an obligation to provide facilities to a charter school. It requires *"each"* school district in which a charter school operates to make facilities available to accommodate that district's students, and provides that "each charter school desiring facilities from *a* school district in which it is operating shall provide the school district with a reasonable projection of the charter school's average daily classroom attendance by in-district students." (§ 47614, subd. (b)(2), italics added.) Because several districts are frequently encompassed in a common geographical area, a charter school will often operate in more than one district. However, the statute does not restrict the school to requesting facilities from only one of the districts in which it is situated if students from all the overlapping districts attend the school. In plain, straightforward language, the statute permits the school, if it has the requisite projected student enrollment from each district in which it operates, to request facilities from all those districts, and it mandates all those districts to provide facilities to accommodate their in-district students who attend that charter school, if their projected number meets the statutory minimum. Therefore, if a charter school has elementary and high school students and it operates, geographically, in both an elementary and high school district, both districts are obligated to provide facilities if the requisite number of students from both districts attend the school.

### c. *Unfair Consequences*

Sequoia contends that "principles of accountability and representation" support a construction of section 47614 that makes the district that approved a school's charter responsible for providing its facilities.

To support its contention, Sequoia relies on the following language in *Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 893 [113 Cal.Rptr.2d 483] (*Jurcoane*): " '*When uncertainty arises in a question of statutory interpretation*, consideration must be given to the consequences that will flow from a particular interpretation. [Citation.] In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences. [Citations.] " '[W]*here the language of a statutory provision is susceptible of two constructions*, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted.' " [Citation.]' [Citation.]"

Sequoia has neglected to include the introductory sentence to this quotation from *Jurcoane*, and fails to heed the court's emphases in the passage it quotes. As *Jurcoane* correctly stresses at the outset of the paragraph, *"If statutory language is ambiguous, and only then,* we must construe statutes to ensure reasonable, not absurd, results, consistent with overall legislative intent." (*Jurcoane, supra*, 93 Cal.App.4th at p. 893.) As we have discussed at length, the language of section 47614 is neither ambiguous, uncertain, nor susceptible of two constructions. It expressly and unmistakably requires a school district to make facilities available to a charter school that operates in that district if the requisite number of in-district students is projected to enroll in the school. Consequently, the rule that statutes must be construed to ensure reasonable results, which comes into play only when statutory language is not clear, is inapplicable here. Therefore, it is unnecessary to address Sequoia's argument based on this rule.

### II.

Sequoia contends the court erred in rejecting its decision that Aurora had failed to demonstrate a reasonably projected enrollment of "80 units of average daily classroom attendance" of Sequoia district students for the 2002–2003 school year, as required by section 47614, subdivision (b)(2) and (4) for entitlement to district facilities.[3]

---

[3] We deferred Sequoia's requests to take judicial notice of California Department of Education records showing the average daily attendance at Aurora for the 2002–2003 school year until we considered the merits of the case. We now deny the request.

Aurora sought a writ of mandate under Code of Civil Procedure 1085 to compel Sequoia to provide the facilities to which it argued it was statutorily entitled. ■ A writ of mandate may be issued to a public agency "to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled . . . ." (Code Civ. Proc., § 1085.) Traditional mandamus lies "to correct abuses of discretion, and will lie to force a particular action by the [agency] when the law clearly establishes the petitioner's right to such action." (*Miller Family Home, Inc. v. Department of Social Services* (1997) 57 Cal.App.4th 488, 491 [67 Cal.Rptr.2d 171] (*Miller*).)

■ Courts exercise limited review in ordinary mandamus proceedings. They may not reweigh the evidence or substitute their judgment for that of the agency. They uphold an agency action unless it is arbitrary, capricious, lacking in evidentiary support, or was made without due regard for the petitioner's rights. (*Miller, supra,* 57 Cal.App.4th at p. 491; *McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786 [52 Cal.Rptr.2d 466] (*McGill* ).) However, courts must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute. (*McGill,* at p. 1786.) Because trial and appellate courts perform the same function in mandamus actions, an appellate court reviews the agency's action de novo. (*Ibid.*)

■ To qualify for district facilities, a charter school "*shall* provide the school district [in which it is operating] with a *reasonable projection* of the charter school's average daily classroom attendance by in-district students for the following year," and the district "*shall* allocate facilities to the charter school for that following year based upon this projection." (§ 47614, subd. (b)(2), italics added.) If, during the "following year," the average daily attendance of the charter school is less than it projected, "the charter school *shall* reimburse the district for the over-allocated space at rates to be set by the State Board of Education." (§ 47614, subd. (b)(2).) A district may deny a facilities request if it is based on a projection of fewer than 80 units of average daily classroom attendance for the year. (§ 47614, subd. (b)(4).) "Shall," as used in the statutes comprising the Education Code, is mandatory, and "may" is permissive. (§ 75.)

The statute is silent as to any mechanism for calculating the "reasonable projection" of in-district students, the evidentiary standard of proof for the projection, the procedure for the district to question the reasonableness of the projection, or the district's right to deny the request when the school's projection is for 80 or more units of average daily attendance.

By modifying "projection" with the adjective "reasonable" (§ 47614, subd. (b)(2)), the statute necessarily implies the charter school must offer

some explanation in its facilities request for the basis for its projection. However, the statute does not require the school to demonstrate arithmetical precision in its projection or provide the kind of documentary or testimonial evidence that would be admissible at a trial. Rather, the school is subsequently penalized if its projection was incorrect by having to reimburse the district for over-allocated space. (§ 47614, subd. (b)(2).)

■ Therefore, in the absence of any other articulated statutory procedures for requesting facilities, section 47614 requires a district to allocate facilities to a requesting charter school once the school provides a reasonable projection of at least 80 units of average daily attendance for the following year. (§ 47614, subd. (b)(2).) Aurora's December 2001 facilities request for the 2002–2003 school year was sufficiently detailed to make its projection of 110 students inherently reasonable. The request explained that the projection was based on Aurora's historical attendance rates (it had then been in operation for two years), its current enrollment of 90 students, the expressed interest of current students and their families of continuing education at Aurora, and the expressed interest of prospective students and their families in attending Aurora during the next academic year. It anticipated a student body of 30 freshmen, 30 sophomores, 30 juniors, and 20 seniors. Because Aurora satisfied its statutory requirements for requesting facilities, Sequoia was statutorily obligated to allocate them. Sequoia's refusal to do so was an abuse of discretion, and the trial court did not err in granting Aurora mandamus relief.[4]

---

[4] Section 47614, subdivision (b)(6) authorizes the State Board of Education to adopt implementing regulations, including defining the procedures and establishing timeliness for the request of facilities. In December 2001, when Aurora requested facilities, and in March 2002, when Sequoia rejected the request because the projection did not "appear realistic," the Board had proposed such regulations, but they did not become operative until August 29, 2002, one day after the hearing on this case. (Cal. Code Regs., tit. 5, §§ 11969.1–11969.9.) The regulations require the charter school to submit a written facilities request that includes, inter alia, reasonable projections of in-district and total average daily attendance and in-district and total classroom average daily attendance and a description of the methodology for the projections. (*Id.*, § 11969.9, subd. (c)(1)(A) & (B).) The district "shall review the projections and provide the charter school a reasonable opportunity to respond to any concerns raised by the school district regarding the projections." (*Id.*, § 11969.9, subd. (d).)

Even if these regulations were fully operative when Aurora made its December 2001 facilities request, Sequoia's March 2002 denial would be an abuse of discretion. Although the regulations permit a district to question the projected enrollment, they do not permit the district to deny the request once the school has responded to the district's concerns with a showing of a projected 80 units of average daily attendance. Sequoia's denial raised a concern about Aurora's projected attendance and invited Aurora to respond. Aurora did so via the declaration of Alice Miller in support of Aurora's mandamus petition. She declared that Aurora "historically maintained 95 percent attendance of students," and her declaration included documents from approximately 93 in-district students who were either currently attending Aurora and planning to continue or had applied for admission for the 2002–2003 school year.

## DISPOSITION

The judgment is affirmed.

Simons, J., and Gemello, J., concurred.