Filed 6/19/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| WESTCHESTER SECONDARY CHARTER SCHOOL,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT et al.,<br><br>    Defendants and Respondents. | B261234<br><br>(Los Angeles County<br>Super. Ct. No. BS147845) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joanne B. O'Donnell, Judge.  Affirmed.

McKenna Long & Aldridge, LLP, Jeffrey D. Wexler and Charles A. Bird for Plaintiff and Appellant.

Ricardo J. Soto, Julie Ashby Umansky, Phillipa L. Altmann; Latham & Watkins, James L. Arnone, Winston P. Stromberg and Lucas I. Quass for California Charter Schools Association as Amicus Curiae on behalf of Plaintiff and Appellant.

David R. Holmquist, Nathan A. Reierson, Joanna Braynin-Sotolov; Orbach Huff Suarez & Henderson, LLP, David M. Huff and Marley S. Fox for Defendants and Respondents.

\* \* \* \* \* \*

This appeal stems from Westchester Secondary Charter School's (WSCS) request for classrooms and related space for the 2014-2015 school year. Los Angeles Unified School District (the District) offered WSCS space at Crenshaw High School (Crenshaw). WSCS objected to this offer and filed a petition for writ of mandate in April 2014. WSCS sought a peremptory writ ordering the District to comply with its obligations under Proposition 39 (as approved by voters, Gen. Elec. (Nov. 7, 2000); Ed. Code, § 47614)[1] to "make reasonable efforts to provide the charter school with facilities near to where the charter school wishes to locate." (§ 47614, subd. (b).) The court rejected WSCS's arguments that the District had not complied with its obligations under Proposition 39, and it denied the writ petition in this respect. We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

### 1. Charter Schools Act and Proposition 39

The Legislature enacted the Charter Schools Act of 1992 (§ 47600 et eq.) "to provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently from the existing school district structure." (§ 47601.) "Charter schools are public schools '"free from most state laws pertaining uniquely to school districts."' [Citation.] The freedom granted to charter schools is intended to promote choice and innovation, and to stimulate 'competition within the public school system.'" (*California Charter Schools Assn. v. Los Angeles Unified School Dist.* (2015) 60 Cal.4th 1221, 1228 (*Cal. Charter Schools Assn.*).) Persons wishing to establish a charter school do so by submitting a petition for establishment to the governing board of a school district. The petition is signed by a specified percentage of either teachers or parents and provides detailed information about the school's proposed operations. (§ 47605, subds. (a)(1), (g); *Ridgecrest Charter School v. Sierra Sands Unified School Dist.* (2005) 130 Cal.App.4th 986, 992 (*Ridgecrest*).) After reviewing the petition and holding a public hearing on the matter, the governing

---

[1]    Further undesignated statutory references are to the Education Code.

board shall grant the petitioners a charter "if it is satisfied that granting the charter is consistent with sound educational practice." (§ 47605, subd. (b).) If the governing board denies the petition, the petitioners may submit the petition to the county board of education, and if the county board denies the petition, the petitioners may submit it to the state board of education. (§ 47605, subd. (j).) "In reviewing petitions for the establishment of charter schools . . . , the chartering authority shall be guided by the intent of the Legislature that charter schools are and should become an integral part of the California educational system and that establishment of charter schools should be encouraged." (§ 47605, subd. (b).)

Once established, charter schools have limited means of getting public funds to cover the cost of facilities. (*Cal. Charter Schools Assn., supra*, 60 Cal.4th at p. 1228.) If they do not have enough funds to rent or build their own facilities, charter schools must often rely on facilities controlled by the school districts with which they compete. (*Ibid.*) "Before the adoption of Proposition 39, a charter school was entitled 'to use, at no charge, facilities not currently being used by the school district for instructional or administrative purposes, or that have not been historically used for rental purposes.' (Former § 47614, as added by Stats. 1998, ch. 34, § 15, p. 202.) In other words, charter schools had access only to public school facilities that districts were not using." (*Ibid.*)

In November 2000, the voters approved Proposition 39, which changed how school districts must share facilities with charter schools. (*Cal. Charter Schools Assn., supra*, 60 Cal.4th at p. 1228; *Sequoia Union High School Dist. v. Aurora Charter High School* (2003) 112 Cal.App.4th 185, 189.) Proposition 39 amended section 47614 to reflect the people's intent "that public school facilities . . . be shared fairly among all public school pupils, including those in charter schools." (§ 47614, subd. (a).) Section 47614 now provides in pertinent part: "Each school district shall make available, to each charter school operating in the school district, facilities sufficient for the charter school to accommodate all of the charter school's in-district students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending other public schools of the district. . . . The school district shall make *reasonable efforts*

3

to provide the charter school with facilities *near to where the charter school wishes to locate*, and shall not move the charter school unnecessarily." (§ 47614, subd. (b), italics added.)

To obtain school district facilities, an existing charter school must submit a written facilities request for the upcoming school year on or before November 1 of the preceding fiscal year. (Cal. Code Regs., tit. 5, § 11969.9, subd. (b).) Among other things, the facilities request should set forth a reasonable projection of average daily attendance (ADA) (Cal. Code Regs., tit. 5, § 11969.2, subd. (a)) and provide "information regarding the district school site and/or general geographic area in which the charter school wishes to locate." (Cal. Code Regs., tit. 5, § 11969.9, subd. (c)(1)(A), (E).) The school district has until February 1 to respond with "a preliminary proposal regarding the space to be allocated to the charter school." (Cal. Code Regs., tit. 5, § 11969.9, subd. (f).) The charter school shall respond to the preliminary proposal in writing on or before March 1. On or before April 1, the school district must send the charter school a final notification of the space offered to the school. (Cal. Code Regs., tit. 5, § 11969.9, subds. (g), (h).)

## 2. *WSCS's Request for Facilities for the 2014-2015 School Year*

The Los Angeles County Office of Education authorized WSCS as a public charter school to serve students in sixth through 12th grades. The school targets Westchester students and students in other communities who have traditionally attended Westchester schools. WSCS's first year in operation was the 2013-2014 school year. That year, it had approximately 220 students in grades six through 10. A church in Westchester housed the WSCS campus.

In November 2013, WSCS submitted a facilities request to the District for the 2014-2015 school year. WSCS projected ADA of approximately 253.5 students for the year. The facilities request stated that WSCS's "preferred school sites are located in Westchester," where it was then located. The request listed a number of school sites in order of priority. WSCS's first choice was Orville Wright Middle School (Wright) in Westchester. Its second choice was Westchester Enriched Sciences Magnet (WESM), also in Westchester. The facilities request further explained that the school's chartering

4

entity conditioned its approval on the basis that "WSCS's site 'shall be in Westchester or one of the target communities identified'" in the school's petition for establishment. These target communities included View Park-Windsor Hills, Ladera Heights, Playa del Rey, and Playa Vista.

WSCS's third through ninth choices were located in either Westchester, Playa del Rey, or Playa Vista. The school also would "consider an alternative agreement for sites such as Emerson Manor" (Emerson) in Westchester, which was a former elementary school that the District was using for adult education classes. Assuming the District was unable to offer WSCS space in Westchester, the school was willing to "consider Marina del Rey Middle School, or any other campuses reasonably close to Westchester." It noted, however, that to accept the Marina del Rey school, it would have to obtain a material revision of its charter from the Los Angeles County Office of Education because the area was not one of the target communities identified in its charter petition.

In January 2014, the District sent WSCS a preliminary proposal of facilities offering 10 classrooms and an administrative room at Crenshaw (also known as Crenshaw Business, Entrepreneurship, and Technology Magnet). WSCS responded by letter in February 2014 that it had several concerns with the offer of space. First, the offer of space at Crenshaw did not fulfill the District's obligations under section 47614 to make reasonable efforts to place the school near to its desired location. WSCS asserted Crenshaw was 6.4 miles from Wright and 7.4 miles from WESM, too far for many of its students to travel. WSCS believed there was sufficient space at a number of the schools it identified in its facilities request. Placing WSCS at Crenshaw put it outside the target communities of its charter and would prevent it from serving the students it was designed to serve. Second, WSCS was concerned that the District had not offered it sufficient classrooms and nonteaching space.

In March 2014, the District's manager for Proposition 39 implementation, Sean Jernigan, contacted the principal of WSCS. According to the principal, Jernigan said the superintendent of the District had agreed to give WSCS space at one of its desired schools—WESM in Westchester. The principal requested 13 classrooms at WESM. She

5

understood Jernigan was going to "get back to [her]" about the number of classrooms, but he never responded further.

Instead, in April 2014, the District sent WSCS a final notification offering it space at Crenshaw. The District argued Crenshaw was near where WSCS wished to locate, insofar as 6.4 miles from Wright or 7.4 miles from WESM was "near" in the context of a school district that spans 710 square miles. WSCS accepted the offer solely for the purpose of ensuring that it had space to operate, in the event that it did not secure appropriate space in Westchester for the 2014-2015 school year.[2] In June 2014, WSCS learned that it could continue to lease the church space it was using for the 2013-2014 school year, and it informed the District that it would not use the Crenshaw space.

### 3. *The Writ Petition and the Court's Ruling*

The day after receiving the District's final notification of space, WSCS filed the writ petition for an order compelling the District[3] to make reasonable efforts to provide the school with facilities near to where it wished to locate (as well as an order "to hereafter comply fully with Proposition 39" and the implementing regulations). Besides the location of the facilities, the writ petition also addressed the number of classrooms allocated to WSCS. The petition asserted that the District had failed to meet its

---

[2] WSCS contends this appeal is not mooted by the fact that the 2014-2015 school year will have ended by the time we rule on the appeal. The District does not argue the appeal is moot. We agree with WSCS that the appeal should not be dismissed for mootness. An exception to the mootness doctrine exists when "there is a distinct possibility that the controversy between the parties may recur." (*Bullis Charter School v. Los Altos School Dist.* (2011) 200 Cal.App.4th 1022, 1034 (*Bullis Charter School*).) Because the process by which charter schools must request facilities is an annual one, the same or a similar controversy is likely to recur between these parties, and the controversy is therefore not moot. (*Ibid.*)

[3] Respondents below and on appeal also include former superindent of the District John E. Deasy and the District's board of education. For ease of reference, we will continue to refer to the District alone.

obligation to allocate a sufficient number of classrooms to WSCS. The court held a hearing on the petition in December 2014.

In January 2015, the court entered a judgment denying the petition in part and granting it in part, as follows. The court denied the petition as to WSCS's claim that the District had failed to make reasonable efforts to locate the school near to where it wished to be located. It also denied WSCS's related claim that the District's decision not to offer the school facilities at WESM or Emerson was arbitrary and capricious. The court granted the petition only as to the claim that WSCS was afforded insufficient classroom space. The court's ruling regarding the classroom space is not at issue on appeal. The District did not appeal from the judgment, and WSCS has raised no issue with this aspect of the ruling on appeal.

As to location, the court noted that "near" is a flexible concept in the statutory and regulatory scheme. Section 47614 itself does not define near, and the only regulatory guidance on location merely places limits on the allocation of facilities outside the school district's boundaries. (Cal. Code Regs., tit. 5, § 11969.6.) The court explained that, as long as a district expends "'reasonable efforts' to provide facilities 'near to where the charter school wishes to locate,' [citation], there does not appear to be a location that is so distant that the location alone would merit the issuance of a writ setting it aside." The court therefore held that the Crenshaw location—less than 10 miles away from WSCS's requested facilities within a district measuring over 700 square miles—was insufficient alone to merit granting the petition.

But WSCS principally argued that the District did not expend "reasonable efforts." That is, reasonable efforts by the District would have resulted in placement at either WESM or Emerson, and WSCS was thus entitled to a writ compelling the District to place the school at one of these two locations. The court held this argument lacked merit. As to WESM, the school's argument took issue with the number of rooms the District identified as available. WSCS asserted that rooms identified as occupied were actually available and "suggest[ed] ways in which the District could and should have worked to accommodate [WSCS] by altering the operation of the programs in WESM." The court

7

rejected this approach, saying: "The statutory obligation to expend 'reasonable efforts' to place a charter school near its preferred location does not authorize [WSCS] to second-guess the District's physical organization of the programs operating at WESM— reallocating spaces and re-prioritizing room usage in order to find enough room for [WSCS]. Indeed, in many cases, [WSCS]'s arguments regarding what the District should have done contradict the purposes of Proposition 39 by placing [WSCS] in a privileged position with respect to both the district's students and other charter students as well. The District's opposition includes a reasoned declaration from WESM's Vice Principal, discussing [WSCS]'s proposals for finding space on campus, and indicating why such proposals are untenable [citation]. [WSCS]'s contention that the District could have allocated its space in a manner more beneficial to WSCS does not demonstrate that the District's considerations and decisions were not 'reasonable efforts' as required by Section 47614(b) or that they were arbitrary, capricious, without evidentiary support or otherwise contrary to law."

As to Emerson, the court noted the location was an adult education facility with no current nonadult instruction. The court did not agree that the District was required to offer WSCS space there when the District was not using the location to educate juvenile or adolescent students. WSCS had not carried its burden of showing the District erred by failing to make Emerson available.

The court entered a judgment consistent with its ruling in January 2015. WSCS filed a timely notice of appeal.[4]

---

**4**     The District contends we should strike the opening brief for failure to include a statement of appealability, but we decline to do so. The opening brief identified the final judgment from which WSCS appealed. Under the Rules of Court, the opening brief should also "explain why the order appealed from is appealable." (Cal. Rules of Court, rule 8.204(a)(2)(B).) If the brief does not comply with this rule, the court has the discretion to "[d]isregard the noncompliance" (rule 8.204(e)(2)(C)), especially where the judgment is clearly appealable. (*Red Mountain, LLC v. Fallbrook Public Utility Dist.*

## STANDARD OF REVIEW

The court may issue a writ of mandate "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station." (Code Civ. Proc., § 1085, subd. (a).) "'The availability of writ relief to compel a public agency to perform an act prescribed by law has long been recognized.'" (*Bullis Charter School, supra*, 200 Cal.App.4th at p. 1035.) More specifically, courts have recognized that traditional mandamus proceedings are appropriate to enforce a school district's obligations under Proposition 39. (*Bullis Charter School*, at p. 1036.)

"'Courts exercise limited review in ordinary mandamus proceedings. They may not reweigh the evidence or substitute their judgment for that of the agency. They uphold an agency action unless it is arbitrary, capricious, lacking in evidentiary support, or was made without due regard for the petitioner's rights. [Citations.] However, courts must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute. [Citation.] Because trial and appellate courts perform the same function in mandamus actions, an appellate court reviews the agency's action de novo.'" (*Bullis Charter School, supra*, 200 Cal.App.4th at p. 1036.) When the trial court resolves conflicting evidence in ruling on a traditional writ of mandate, we inquire whether the findings and judgment of the court are supported by substantial evidence. (*Id.* at p. 1037.) When the court resolved questions of law and applied the law to undisputed facts, our review is de novo. (*Ibid.*)

## DISCUSSION

### 1. *The Crenshaw Campus Represents a Location Near to WSCS's Desired Location*

Underlying all of WSCS's arguments is the notion that the District had to make reasonable efforts to place WSCS at a location of its exact choosing. But section 47614,

---

(2006) 143 Cal.App.4th 333, 343.) We exercise our discretion to disregard the noncompliance here.

subdivision (b) does not necessarily entitle WSCS to facilities at the exact location that it desires. (*Los Angeles Internat. Charter High School v. Los Angeles Unified School Dist.* (2012) 209 Cal.App.4th 1348, 1362 (*International Charter High School*).) "[N]othing in this statute mandates that districts place charter schools where they want." (*Id.* at p. 1361.) "[S]ection 47614, subdivision (b) only directs school districts to make '*reasonable efforts*,' and then only to locate the charter school '*near*' where it wishes." (*Ibid.*) WSCS contends Crenshaw is not even "near" its desired location.

We disagree. Crenshaw is near to the locations identified in WSCS's facilities request. When WCSC submitted its facilities request, it was operating at a church in Westchester, and it said its preferred locations were in Westchester. Its facilities request stated that it would also consider other campuses "reasonably close" to Westchester. As the trial court noted, "near" is a flexible concept, and the statutory and regulatory scheme does not define the term. Crenshaw is in the same geographic area as the Westchester schools that WSCS requested, "Educational Service Center—West." Further, the District presented undisputed evidence that the Crenshaw campus is only 2.53 miles from the perimeter of Westchester. WSCS contends the Crenshaw campus is not near WSCS's desired location because it is 6.5 miles from Wright and 7.4 miles from WESM, WSCS's first and second choice campuses. WSCS argues it is the distance to the requested campuses that is relevant, not the distance to the border of Westchester. This argument is unpersuasive. The facilities request stated that the "preferred school sites are located in Westchester," and WSCS would "consider . . . any other campuses reasonably close to Westchester." Insofar as WSCS expressed a preference for something in Westchester or reasonably close to Westchester, the distance to Westchester in general is certainly relevant.

In determining that 2.53 miles is near to the desired location, we are guided by the opinion of our colleagues in Division Three in *International Charter High School*. In that case, Los Angeles International Charter High School (LAICHS) requested space within the area served by Franklin High School, which was situated in "local district 4." (*International Charter High School, supra*, 209 Cal.App.4th at p. 1352.) After the

10

District determined that it was unable to offer any space to LAICHS, the charter school filed a petition for writ of mandate. The trial court issued a peremptory writ of mandate commanding the District to make an offer of facilities to LAICHS. (*Id.* at p. 1353.) The District filed a return on the writ stating that it had offered LAICHS space at Belmont High School. The trial court ruled that the District's offer of facilities at Belmont High School complied with the writ and discharged the writ. (*Ibid.*) On appeal, LAICHS contended the District abused its discretion in not offering LAICHS facilities at Franklin High School, the school that most of LAICHS's students would attend, were they not attending a charter school. (*Id.* at p. 1361.) The court held Belmont High School was "near" to LAICHS's preferred area in that it was located in local district 4, just as Franklin High School was, and Belmont High School was only three miles outside the geographic area identified by LAICHS in its facilities request. (*Id.* at pp. 1361-1362.)[5]

If three miles outside the desired area is near, 2.53 miles outside the desired area is also near. We reject the argument that the District abused its discretion because Crenshaw is not near its desired location. Section 47614, subdivision (b) does not mandate that schools districts make reasonable efforts to place charter schools exactly where they wish. Instead, the District was required to expend reasonable efforts to place WSCS only near its desired location. The District did, indeed, offer WSCS space near its desired location.

Despite the offer of space near the desired location, WSCS argues the District abused its discretion in failing to offer WSCS space at two specific campuses—WESM and Emerson. We begin with the WESM-related arguments and then move on to Emerson.

---

[5]    The District requests that we take judicial notice of a print out from Google Maps showing the distance between Belmont High School and Franklin High School. Because this material is unnecessary to our resolution of this appeal, we deny the request. (*St. Croix v. Superior Court* (2014) 228 Cal.App.4th 434, 447.)

## 2. *The District Did Not Abuse Its Discretion in Placing the Incubator School Instead of WSCS at WESM*

WSCS contends the District abused its discretion by placing a District pilot program, the Incubator School (Incubator), at WESM instead of WSCS. WSCS asserts the District acted arbitrarily and capriciously because the decision to place Incubator at WESM violated the District's own policies and improperly favored Incubator. WSCS further argues this failure to follow District policies violated the requirement to make reasonable efforts to place a charter school near its desired location. We are not so persuaded.

In addition to the pertinent statutory and regulatory mandates, the District uses "matching guidelines" to resolve the many competing facilities requests from charter schools. Under these guidelines, the District "makes every reasonable effort to locate space on a single site, or only if necessary on multiple sites, in the charter applicant's geographic area of interest." In cases when more than one charter school requests the same space, the District "examines whether the potential match would utilize all available classrooms and whether the match represents a full, single site offer. Priority is given to those charters where these two goals can be achieved."

The District received 86 requests for facilities from charter schools for the 2014-2015 school year. It determined 78 of those requests came from eligible charter schools and made offers of space to all 78 of those applicants. Of those 78, 17 charter schools besides WSCS requested space in Educational Service Center—West. The District, therefore, had to work with many competing requests for space, and sometimes competing requests for the exact same space. For instance, WSCS and Ocean Charter School both requested space at WESM. Ocean Charter School was already co-located at WESM for the previous school year. Once the District places a charter school at a particular location, it "shall not move the charter school unnecessarily." (§ 47614, subd. (b).) Thus, the District allocated the requested space at WESM to Ocean Charter School.

In September and October 2013, the District had conducted a comprehensive "Capacity Assessment Roadshow" to precisely assess the capacity of each school site in

12

terms of the number of classrooms, the manner in which the schools used those classrooms, and the schools' operating capacity. The District's capacity assessment determined that, as of February 2014, WESM had 10 unassigned classrooms, after the District allocated space for Ocean Charter School there.[6] Incubator required seven classrooms. WSCS required 10 classrooms plus an administrative office space. WSCS contends the District acted arbitrarily and capriciously because WSCS would have used more classrooms than Incubator and thus would have maximized the use of available classrooms under the District's policy. Moreover, it argues because the District did not follow its policy of maximization, it did not follow its other policy of making reasonable efforts to place the charter school not just near its desired location, but "*in* the charter applicant's geographic area of interest." (Italics added.)

We reject the contention that the District abused its discretion for failing to strictly comply with its internal guidelines. As Jernigan, the District's Proposition 39 manager, describes it, the "District's matching guidelines are just that—guidelines. They cannot be applied in a vacuum and without rationale. In allocating space to charter schools, the District must consider the impact on other public school students, both those attending District schools and those attending other charter schools requesting space." (Italics omitted.) The District's approach of balancing impacts is consistent with the law. We have already established section 47614 does not entitle a charter school to facilities in the exact location or locations it desires. This is especially the case "if so doing would favor

---

**6** WESM housed a number of programs in addition to Ocean Charter School for the 2013-2014 school year. WESM itself is comprised of an aviation and aerospace magnet, a health and sports medicine magnet, and an environmental and natural science magnet. The school also housed the Alternative Education and Work Center, an independent study program that provides dropouts a way to earn a high school diploma; City of Angels, the District's independent study program for kindergarten through 12th grade students; Central High School/Tri-C, a multi-site dropout prevention and credit recovery school; and Loyola Marymount University. For the 2014-2015 school year, WESM housed all these programs except the Alternative Education and Work Center, and it added Incubator.

charter school students over other district students. Proposition 39 requires that facilities 'should be shared *fairly* among all public school pupils, including those in charter schools.' (§ 47614, subd. (a), italics added.) The [implementing regulations] state that '[i]n evaluating and accommodating a charter school's request for facilities pursuant to . . . section 47614, the charter school's in-district students must be given the *same* consideration as students in the district-run schools, subject to the requirement that the facilities provided to the charter school must be contiguous.'" (*International Charter High School, supra*, 209 Cal.App.4th at p. 1362.) To put the charter school students' needs over those of other school district students "would not 'strike a fair balance between the needs of the charter school and those of the district-run schools.'" (*Ibid.*)

Incubator was housed at Playa Vista Elementary School during the prior school year. The District had to relocate Incubator for the 2014-2015 year because Playa Vista Elementary School no longer had sufficient classroom space to accommodate Incubator. The District chose WESM because it was close to Playa Vista Elementary School and had sufficient space for Incubator. Thus, far from being arbitrary and capricious, the District's decision to locate Incubator at WESM had a reasonable basis.

If we follow WSCS's logic, the District should have put WSCS at WESM and put Incubator elsewhere. WSCS argues "[b]ecause Incubator was not on the WESM campus [previously], putting it on a campus other than WESM for the 2014-15 school year would have caused it no disruption or dislocation whatsoever." This argument assumes Incubator students would not have suffered any dislocation or disruption in moving to a location farther from their previous Playa Vista location. If there was some other campus close to Playa Vista that could have housed Incubator without any more disruption, WSCS has not identified it. The process the District undertook to resolve all Proposition 39 requests was complex and involved "a variety of stakeholders." Jernigan described how the District did not just look at WSCS's needs, but at how to balance the needs of all the programs in the area. And like a "Rubik's Cube," if "you only have one piece that doesn't fit, you're likely to scramble the whole thing before you fix that." The evidence demonstrated the District's decision to place Incubator at WESM was reasonable, not

14

arbitrary and capricious.[7]  As long as an agency's decision is not arbitrary, capricious, or lacking in evidentiary support, we must uphold the agency's determination even if reasonable minds may disagree as to the wisdom of the action.  (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995.)

WSCS relies on *Ridgecrest* to suggest that the District was obligated to move Incubator and accommodate WSCS.  *Ridgecrest* is plainly distinguishable and does not provide the support for which WSCS argues.  In that case, Sierra Sands Unified School District responded to a request for facilities from Ridgecrest Charter School by offering the charter school "9.5 classrooms at five different school sites separated by a total of 65 miles."  (*Ridgecrest, supra*, 130 Cal.App.4th at p. 991.)  The charter school petitioned for a writ of mandate compelling the school district to provide "'contiguous'" school facilities at a single site or, if that was not possible, to provide facilities in such a way as to "'minimize student dislocation and maximize student safety.'"  (*Id.* at p. 996)  The court observed that one of the implementing regulations mentioned "'accommodating a charter school might involve moving district-operated programs or changing attendance areas.'"  (*Id.* at p. 1000, italics omitted.)  Thus, the regulations seemed to "contemplate that some disruption and dislocation of the students and programs in a district may be

---

[7]  WSCS points to the telephone conversation between WSCS's principal and Jernigan in March 2014 as evidence that the District should have placed WSCS instead of Incubator at WESM.  According to the principal, Jernigan said the District had found space for WSCS at WESM, but Jernigan never got back to her after that, and the final notification offered space at Crenshaw.  Jernigan recalled the conversation differently, however.  He thought the principal had misunderstood, and her interpretation of an offer was "a bit of an overreach."  He contacted her to see whether she had an alternative to the preliminary proposal that was acceptable to her, but he would not have said the superintendent had approved any alternative proposal.  He would have had to determine whether the proposal was feasible, and then would have taken it to the superintendent for approval.  It was after this conversation that the District decided to place Incubator at WESM, an offer that it made on or about April 1, 2014.  Even if the conversation between Jernigan and the WSCS principal contained an "offer" of space at WESM, we are not convinced the District abused its discretion by changing course and giving the space to Incubator.

necessary to fairly accommodate a charter school's request for facilities." (*Ibid.*) The Court of Appeal noted section 47614's mandate that public school facilities be shared fairly among charter and noncharter students and held that "[p]roviding facilities, whether or not they are reasonably equivalent in other respects, at five different school sites does not strike a fair balance between the needs of the charter school and those of the district-run schools. The District failed, in other words, to demonstrate either that it could not accommodate [Ridgecrest Charter School] at a single school site, or that it had minimized the number of sites in a manner consistent with the intent of the Act." (*Ridgecrest, supra*, at p. 1006.)

Accordingly, the school district in *Ridgecrest* had not at all complied with the mandate of section 47614 to provide reasonably equivalent, contiguous facilities, and thus was required to consider "some disruption and dislocation of the students and programs in a district . . . to fairly accommodate a charter school's request for facilities." (*Ridgecrest, supra*, 130 Cal.App.4th at p. 1000.) The *Ridgecrest* school district's offer of classrooms at five different sites separated by 65 miles hardly compares to the District's offer in this case for space at a single campus 2.53 miles away from the desired area. When the District's offer already fairly accommodates the charter school's right to facilities near its desired location, the District is not compelled to consider even more disruption and dislocation to other students to provide the charter school with the exact location it desires.

In sum, the law requires the District to treat charter and noncharter students fairly, but not favor one group over the other. The District had a reasoned basis for placing Incubator at WESM and offering WSCS other facilities near its location. We decline to hold the District abused its discretion and disturb this decision.

### 3. *The District Did Not Abuse Its Discretion in Failing to Place Both Incubator and WSCS at WESM*

WSCS next contends the District abused its discretion by failing to put WSCS at WESM even with Incubator there. Part of the District's capacity assessment involved meeting with campus administrators and identifying so-called set asides—that is,

classrooms used for purposes other than general education—at each campus. One of the interrogatories WSCS propounded asked the District to state all facts upon which it relied in determining what facilities to offer WSCS. The District's eight-page response described the process it used to administer all facilities requests generally. Among other measures in the process, the District stated that it "engaged in the materially disruptive measure of eliminating set-asides in order to achieve sharing space fairly amongst charter and non-charter students in the District." The eight programs operating at WESM for the 2014-2015 school year, including Incubator and others (see footnote 6, *ante*), used all but three classrooms at the school. This was insufficient to house WSCS, which required at least 10 classrooms and one administrative space. But WSCS contends some of the in-use classrooms represented set asides that could have been eliminated to make room for WSCS. WSCS maintains that if the District had made reasonable efforts to eliminate set asides at WESM, there would have been sufficient space for Incubator *and* WSCS. We again disagree the District abused its discretion in this instance.

Regardless of whether WESM or the District could have eliminated certain set asides and thereby freed up more classrooms, the District had a reasoned basis independent of set asides for not placing both Incubator and WSCS at WESM. WESM's assistant principal, Helene Cameron, oversaw facilities at WESM and personally participated in the capacity assessment with District officials. According to Cameron, the campus "ha[d] no realistic ability to accommodate" more than the eight programs already offered space there. Cameron stated that having more programs would present "significant safety, educational, scheduling, facilities and operational challenges." As examples of the scheduling difficulties, Cameron explained that six of the eight programs on the campus regularly used common spaces such as the auditorium, practice fields and courts, eating areas, and the social hall. On one occasion, Ocean Charter School needed the social hall for a performance at the same time WESM needed it for testing. On another occasion, WESM needed the social hall for several days to set up a homecoming dance, while Ocean Charter School was scheduled to use the hall at the same time. Problems of that nature had become common and routine and were taking significant

17

time and effort to resolve. As an example of safety-related challenges, Cameron cited among other things the verbal and physical altercations between students from different programs, the mixing of many different age groups and grade levels of children (grades kindergarten through 12 were represented on the campus), and the traffic control problems caused by so many cars and people moving in and out of the campus at the same time or at the time that other students are walking near the parking lot to places such as the gymnasium. Cameron observed that the challenges posed by all the different programs on campus were distracting from the primary responsibility of providing a quality education to the students on campus. In light of Cameron's evidence, we cannot say the District acted arbitrarily and capriciously by declining to place a ninth program on the WESM campus.

WSCS claims the District cannot rely on "too many programs" as a rationale because the District's proposal for facilities did not expressly and specifically invoke this rationale. WSCS cites *Ridgecrest* for this purported rule, but *Ridgecrest* does not so hold. Instead, *Ridgecrest* held that "the district must offer some explanation for its decision regarding how the facilities will be allocated between the charter school and the district-run schools. [Citation.] While detailed findings are not necessarily required, the explanation should be thorough enough, and factual enough, to permit effective review by the courts." (*Ridgecrest, supra*, 130 Cal.App.4th at p. 1006.) The District's 24-page final offer of space to WSCS addressed each of WSCS's objections to the preliminary proposal, including the objection to location. The District undoubtedly offered "some explanation" (*ibid.*) for its decision to offer facilities at Crenshaw, and it cited "student safety and welfare" as paramount considerations in its location decision. We have not felt hampered in our review by the lack of more detail in the preliminary and final offers of space. To suggest that the District cannot amplify on the reasons in these documents when litigation ensues, but must explain in detail all of its rationales or risk forfeiture, seems like an unworkable standard to impose. This is especially true when one considers that the District had a limited time frame to respond to 78 requests for facilities from

18

charter schools, some of which, like WSCS, identified multiple campuses for assessments.

WSCS further argues the District cannot rely on the high number of programs at WESM because Cameron's declaration constituted undisclosed expert testimony. This argument also fails. As WESM's assistant principal, Cameron's responsibilities included overseeing facilities. The facts stated in her declaration were observations based on personal knowledge and not opinions. Even if they were opinions, a lay witness may testify to an opinion if it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of his [or her] testimony." (Evid. Code, § 800.)

WSCS additionally argues the high number of programs at WESM cannot justify the failure to place WSCS there because Crenshaw housed a similar number of programs, yet the District decided to place WSCS at Crenshaw. The District proffered evidence that, at the time the District was making its facilities decisions, Crenshaw had many more available classrooms than WESM. Moreover, it had a higher capacity for enrollment than WESM (2,121 students versus 1,803 students) and a lower existing enrollment than WESM (1,089 students versus 1,290 students). In other words, there was reason to believe Crenshaw was better able to house another program.

In short, even if WESM could have eliminated some of its set asides as unnecessary, there was evidence the school could not house a ninth program without significant negative impacts to the students already there. "A holding that the District must provide facilities a charter school requests, on demand and without regard to overcrowding or the impact on other public school students, would tip the balance too far in favor of the charter school." (*International Charter High School, supra*, 209 Cal.App.4th at p. 1362.) It was not an abuse of discretion for the District to refuse a ninth program.

Still, we will briefly address the particular set asides WSCS disputes. WSCS identifies 14 set asides that purportedly could have been eliminated and made available, as follows:

19

Continuing Education Set Asides (five rooms):  The capacity assessment, dated February 2014, determined that five set asides had been allocated to Central High School/Tri-C and one set aside to City of Angels.  But during the 2014-2015 school year, WESM was using the five rooms allocated to Central High School/Tri-C, and Central High School/Tri-C was using three different rooms.  Cameron indicated that, even though Central High School/Tri-C no longer used the five set asides, WESM used them for its own programs because Incubator took over space the WESM programs previously occupied.

Computer Lab Set Asides (one room):  The capacity assessment identified three computer lab set asides.  WESM had only two computer labs for the 2014-2015 school year, though.  Cameron indicated that WESM eliminated the third computer lab to make room for Incubator.  Incubator took over that space, and WESM moved the computers to different rooms around the school.

Music Set Asides (two rooms):  The capacity assessment identified 35 rooms WESM "need[ed] for 9-12 magnet enroll[ment]," separate from the rooms identified as set asides.  Two set asides were identified for music and two set asides for "assembly." WSCS argues the two performing arts teachers used two of these rooms full time, and as such they were included in the 35 rooms used for general instructional purposes and should not have been double counted under set asides.  The performing arts teachers taught a range of courses including guitar, general music, band, advanced band, introduction to theatre, theatre production, music technology, and web master.

Remaining Music Set Asides (two rooms):  If each performing arts teacher had a room in the general instruction category, WSCS argues the two remaining set asides for music and assembly were not necessary because the performing arts teachers needed only one classroom each.  Its evidence is that the performing arts teacher for prior years (2010-2011 and 2011-2012) taught all of his classes in one room, one of the current teachers "sometimes" taught his classes in a single room, and the other current teacher used two rooms that were identical except that one room had chairs and one had desks, and it was possible to use desks that convert into chairs in a single room.

20

Office (one room): WESM identified one of the set asides as an office. In responding to interrogatories, the District stated that the set aside was "a small room" and had been inadvertently identified as a full-sized classroom in the count of total, full-sized classrooms at WESM. WSCS suggests that if this room was not included in the count of total classrooms, it should not be deducted from the total count as a set aside.

Culinary Arts (one room): The capacity assessment identified two set asides for culinary arts. In a separate line item, the capacity assessment identified six classrooms used by "Non QEIA/Non NORM funded teaching positions." "QEIA" is the Quality Education Investment Act of 2006, codified at section 52055.700 et seq. As WESM's principal explained it, the District normally funds teacher positions based on student enrollment. Schools that receive grant money through QEIA may fund additional teacher positions beyond the number justified by student enrollment. A non-QEIA, non-norm teaching position would thus mean a position funded by neither QEIA nor according to the District's normal funding formula. The culinary arts teacher held one of those non-QEIA, non-norm positions—she was funded through the regional occupation program. Because the culinary arts teacher had a non-QEIA, non-norm position, WSCS argues one of the culinary arts set asides must have been double counted under the line item for non-QEIA, non-norm rooms.

Science Labs (two rooms): The capacity assessment identified two set asides as science labs. In response to a request for admission, the District admitted that these two rooms had essentially been double counted: "The District admits that rooms F1 and F3 were utilized as Science Labs in the 2013-2014 school year. The District further admits that rooms F1 and F3 were included in the 2013 WESM Capacity Assessment Summary standard size classroom count as needed and used by WESM and therefore did not need to also be identified therein as School Set-Asides." WSCS argues this admission conclusively established that the science labs should not have been included in the set asides. (Code Civ. Proc., § 2033.410, subd. (a).) Accordingly, the number of set asides could be reduced by two, freeing up two more rooms.

21

The trial court looked at the disputed evidence concerning these set asides and determined the District did not act arbitrarily, capriciously or without evidentiary support in failing to eliminate the set asides.[8] We agree. WSCS disputes many of these set asides on the ground that WESM must have double counted them, that is, counted them in both the set aside category and another category insofar as WESM teachers were using them for general instruction purposes. The only rooms as to which this is conclusively established are the two science labs that were the subject of the request for admission. Otherwise, Cameron declared that WESM had not double counted any classrooms. WSCS disputes several of these other set asides because it essentially disagrees with how WESM was using them, the music rooms in particular. WSCS's speculation that the performing arts teachers did not need two rooms to teach their different types of theatre and music classes is not convincing. The idea that the teachers might require separate performance space and learning space with desks is sensible, and we cannot characterize the failure to force the teachers to use one room as an abuse of discretion.

As Jernigan explained, eliminating set asides was not just a matter of cutting the rooms themselves. The process was more accurately described as cutting programs, which would then result in set asides associated with those programs being eliminated. The District "did look at the potential of cutting back set-asides" at WESM, but determined the "best possible outcome" was not cutting programs and set asides at WESM, but leaving those programs and set asides intact and offering space to WSCS at another campus with more capacity.

Fundamentally, the District offered space *near* WSCS's desired location, complying with section 47614's mandate that it use reasonable efforts to place WSCS

---

**8** Specifically, the court held: "[WSCS]'s contention that the District could have allocated its space in a manner more beneficial to [WSCS] does not demonstrate that the District's considerations and decisions were not 'reasonable efforts' as required by Section 47614(b) or that they were arbitrary, capricious, without evidentiary support or otherwise contrary to law."

*near* its desired location. The statute did not require the District to slash programs or set asides at WSCS's preferred location in an attempt to make room when the District could otherwise fulfill its obligations to find a space near the desired location. The failure to cut more set asides at WESM was not "'so palpably unreasonable and arbitrary as to indicate an abuse of discretion.'" (*International Charter High School, supra*, 209 Cal.App.4th at pp. 1355-1356.)

**4. *The District Did Not Abuse Its Discretion in Declining to Place WSCS at Emerson***

WSCS finally contends the District abused its discretion by declining to place WSCS at Emerson. WSCS argues the District did not make reasonable efforts to provide a space near WSCS's desired location when it did not consider Emerson. We disagree.

Emerson was a closed school site that operated adult education programs and did not house K-12 students. The former elementary school there closed several decades ago. Jernigan explained the District does not generally offer closed school sites to charter schools because it does not provide those school sites to students in District-run schools either. As we noted above, section 47614 and its implementing regulations require only that facilities be shared fairly among charter students and noncharter students and that the District give the two groups the same consideration. (*International Charter High School, supra*, 209 Cal.App.4th at p. 1362.) We cannot say these authorities required the District to offer facilities *not* provided to noncharter students, particularly when the District offered other facilities near WSCS's desired location to comply with its obligations.

The District acknowledged that its online facilities request form allows charter schools to request space at Emerson, and "there have been a few instances where the District has provided closed school sites to charter schools." Jernigan explained, however, that "those arrangements involved reasonably equivalent facilities, alternative agreements outside the Proposition 39 process, and long-term arrangements pursuant to other statutory provisions regarding the use of charter school funds and augmentation grants to significantly improve the condition of the facilities." Moreover, "those facilities had existing amenities that were particular for the specific grade levels served by the

23

charter school occupant." The reasonable inference from Jernigan's evidence is that Emerson was not like those few cases when the District provided closed school sites.

First, Emerson did not constitute "reasonably equivalent" conditions in this case. Section 47614 requires school districts to make available facilities "in conditions reasonably equivalent to those in which the students would be accommodated if they were attending other public schools of the district." (§ 47614, subd. (b).) In determining reasonable equivalency, the implementing regulations require school districts to consider facilities with grade levels similar to those at the charter school. (Cal. Code Regs., tit. 5, § 11969.3, subd. (a)(1).) WSCS served grades six through 10. Emerson was formerly an elementary school and then an adult school and was therefore not serving grade levels similar to WSCS's middle and high school grades.

Second, the District and WSCS had not entered into an "alternative" or "long-term arrangement" for the use of Emerson under other statutory provisions. "[A] charter school and a school district [may] mutually agree to an alternative to specific compliance with any of the provisions of" the implementing regulations. (Cal. Code Regs., tit. 5, § 11969.1, subd. (b).) While the regulations suggest the parties can mutually agree to alternative arrangements, nothing obligated them to enter into the kind of alternative agreements Jernigan described for other closed site campuses.

WSCS argues closed school sites would have been available under former section 47614, before the enactment of Proposition 39, when charter schools were entitled merely to "facilities not currently being used by the school district for instructional or administrative purposes, or that have not been historically used for rental purposes provided the charter school shall be responsible for reasonable maintenance of those facilities." (Former § 47614.) Thus, it contends, closed school sites should continue to be available. This argument misses the mark. According to the District's evidence, closed school sites are sometimes made available to charter schools. But the District has specific duties under the Charter Schools Act of 1992 and Proposition 39 to offer reasonably equivalent, grade-alike facilities, and to do so near the charter school's desired location when reasonable efforts make it possible. WSCS does not dispute that Crenshaw

24

represented a reasonably equivalent, grade-alike facility.  Ultimately, consideration of Emerson was unnecessary here because Crenshaw met the requirements of section 47614, subdivision (b).  It was an equivalent, grade-alike facility in the same geographic area (Educational Service Center—West) as the Westchester schools that WSCS requested, and near to WSCS's desired location in Westchester.  (*International Charter High School, supra*, 209 Cal.App.4th at p. 1360 [the District was not required to consider a middle school campus for the charter school location because the offer of space at a high school met the requirements of an equivalent, grade-alike facility near the charter school's desired area].)

* * * * * *

In sum, we reject WSCS's contentions that the District did not make reasonable efforts to place WSCS near its desired location.  The offer of space at Crenshaw represented facilities near WSCS's desired location.  WSCS was not entitled to a specific location of its choosing, only reasonable efforts to place it near its desired location.  Further, the District did not abuse its discretion by placing WSCS at Crenshaw instead of WESM or Emerson.

**DISPOSITION**

The judgment is affirmed.  The District shall recover costs on appeal.

FLIER, J.

WE CONCUR:

RUBIN, Acting P. J.

GRIMES, J.

25